[No. 23162–6–I.   Division One.   April 23, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. ANDRE
FLOWERS, *Appellant*.

*Jeff Ellis* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

SWANSON, J.—Andre Flowers appeals from the judgment and sentence entered following his conviction for first degree robbery. He contends that the trial court erred in failing to suppress the fruits of an allegedly illegal search and seizure.

The trial court's unchallenged findings of fact, entered following the suppression hearing, establish the following sequence of events. At about 5 p.m. on July 4, 1988, Grant Hensel, a restaurant employee, was robbed at gunpoint while making a deposit in the night depository of a bank at the Aurora Village mall near 205th and Aurora Avenue North in King County. After the robbery, Hensel returned to the restaurant and contacted the police.

At about 5:15 p.m. the same day, Seattle Police Officer Russell Weklych was on routine patrol and stopped to purchase yogurt at the Oaktree Village mall near 103rd Avenue and Aurora Avenue North in Seattle. Officer Weklych heard a radio report of an armed robbery that had just occurred at Aurora Village. The Oaktree Village mall is approximately 6 miles directly south of Aurora Village on Aurora Avenue. The suspects were described as:

> a black male in his 30's and a black female driving a black Volkswagen Rabbit eastbound on 205th from Aurora Village. The male had a short barrelled handgun. Shots had been fired during the robbery.

Finding of fact 5.

Just before stopping at the mall, Officer Weklych had been driving north on Aurora past the Geisha Inn Motel, located at 9613 Aurora Avenue North when he saw a "black

Volkswagen–type car" pull into the motel. The car caught Officer Weklych's attention because it was moving "a little bit fast and a little bit erratically . . .". Officer Weklych, who believed that the car had two black occupants, did not stop.

After hearing the robbery report, Officer Weklych returned to the Geisha Inn to determine if the car he had seen matched the suspect vehicle. Upon returning, Officer Weklych found that "the car generally fit the description," but he did not approach the vehicle to examine it closely. Weklych went into the motel office to talk with the clerk. The clerk told Weklych that:

> the couple was acting nervous and excited. They looked around, out the door and window of the office several times. The black male who was approximately 5'9", 180 pounds with short curly hair per the clerk showed a large sum of money in mostly small bills. The black female who had been driving was wearing sun glasses. The couple checked into room 6 of the motel.

Finding of fact 9.

Based upon the information he had received so far, Officer Weklych believed that the persons in room 6 might be the robbery suspects and decided to investigate further. Officer Weklych's intention was to confirm or eliminate the occupants of room 6 as suspects. An updated radio report provided some additional information about the suspects:

> the male, in his 30's was around 6 feet tall, weighed 180 lbs. and wore sunglasses. The car was a newer black Rabbit or BMW–type car with silver writing on the rear identifying the make of the car. The female was driving. She also wore sunglasses.

Finding of fact 8. At Officer Weklych's request, several backup units arrived at the scene.

Officer Weklych first briefed the other officers about the circumstances and then decided to use a ruse to call one of the suspects out of the room. No attempt was made to examine the black car further. At least three other officers took up positions around the entrance to room 6. Officer Weklych then called room 6 from the motel office and told the woman who answered that additional information was

needed for registration. Shortly thereafter, a woman, subsequently identified as Julieanna Leasure, exited room 6.

As she walked toward the office,

> Ms. Leasure saw Officer Weklych (and perhaps other officers who had then arrived) and yelled "Police" towards her motel room. The officers explained to her that a robbery had recently occurred and that the suspects' description generally matched her car, her friend and her. The officers further explained that they were trying to eliminate her as a suspect or determine if they should investigate further. Ms. Leasure said "I just lent the car out."

Finding of fact 11. Officer Weklych described Ms. Leasure as nervous, agitated, and frightened.

Immediately after Ms. Leasure had called out "police," appellant Flowers opened up the curtains and observed Seattle Police Officer Dave Emerick. Officer Emerick, who had drawn his gun, ordered Flowers out of the room. Flowers was ordered down on his knees and told to interlace his fingers behind his head. Emerick and at least two other officers approached Flowers with guns drawn. Officer Jeffrey Lobb "held Mr. Flowers' fingers with his hand, placed a leg between Mr. Flowers' knees and placed a knee on Mr. Flowers' spine to restrain him." Finding of fact 12.

At this point, Officer Michael Thomas made a brief "sweep" through the room to ensure that no one else was inside. No evidence was obtained during the "sweep." Outside, Officer Emerick told Flowers about the robbery investigation and asked for permission to search the room and car. According to Officer Emerick, Flowers replied, "Sure, go ahead."

The resulting search turned up several weapons and other items of evidence associated with the robbery. Following the search, Flowers was formally arrested and read his *Miranda* rights. Grant Hensel, the robbery victim, was brought to the Geisha Inn within 20 to 60 minutes of the robbery for a showup and identified Flowers and the black car.

Following the suppression hearing, the trial court concluded that, although the officers did not have probable

cause to arrest Flowers initially, there was "reasonable suspicion" that Flowers was involved in the robbery. The trial court further concluded that it was reasonable, given the nature of the crime, the use of weapons, and the officers' concern for their safety, for officers to order Flowers out of the room and detain him. The trial court also found that Flowers' consent to search was freely and voluntarily given.

Flowers subsequently waived his right to a jury trial, and the case was submitted to the trial court on the basis of stipulated facts. Flowers was found guilty as charged, and this appeal ensued.

Flowers first contends that by ordering him out of his room at gunpoint, the officers escalated the encounter into a warrantless "entry" and arrest that were not supported by probable cause or exigent circumstances. The primary focus of this argument therefore is the point in time when Ms. Leasure exited room 6 of the Geisha Inn, observed a police officer, and yelled "police" back toward the room. Almost immediately, appellant Flowers looked out through the curtains and saw the police, who were pointing their guns toward the room. The officers then ordered Flowers out of the room and onto his knees. Virtually simultaneously with Flowers' emergence from the room, Officer Weklych called Ms. Leasure over to him and told her that he was investigating her and her companion as robbery suspects. In response, Ms. Leasure told the officer that "I just lent the car out." Up to this point in time, there is no contention that the officers' actions were illegal or inappropriate for the developing situation. Nor does Flowers seriously dispute that the officers had at least a "reasonable suspicion" sufficient to support a *Terry* investigatory detention.

We note initially that we rest our decision on a different basis than did the trial court, which determined that the officers did not have probable cause to arrest Flowers when he was ordered out of the motel room but that the seizure was nonetheless supported by "reasonable suspicion." *See, e.g., State v. Collins,* 110 Wn.2d 253, 258 n.2,

751 P.2d 837 (1988) (trial court decision may be affirmed on alternative theory, even if not relied upon below, when established by pleadings and supported by proof); *State v. Davis,* 29 Wn. App. 691, 697 n.2, 630 P.2d 938, 17 A.L.R.4th 53, *review denied,* 96 Wn.2d 1013 (1981). We conclude that the unchallenged findings of fact, as well as the record, establish that the officers had probable cause to arrest Flowers. For purposes of this appeal we assume, without deciding, that ordering Flowers out of his motel room at gunpoint was constitutionally equivalent to a warrantless "entry" and arrest in Flowers' home.

██ Probable cause exists

where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that an offense has been committed.

*State v. Terrovona,* 105 Wn.2d 632, 643, 716 P.2d 295 (1986). This determination rests

on the totality of facts and circumstances within the officer's knowledge at the time of the arrest. The standard of reasonableness to be applied takes into consideration the special experience and expertise of the arresting officer.

(Citations omitted.) *State v. Fricks,* 91 Wn.2d 391, 398, 588 P.2d 1328 (1979). While the findings of the trial court following a suppression hearing are of great significance, the constitutional rights at issue necessitate that we undertake an independent evaluation of the record. *State v. Daugherty,* 94 Wn.2d 263, 269, 616 P.2d 649 (1980), *cert. denied,* 450 U.S. 958 (1981); *State v. Dresker,* 39 Wn. App. 136, 139–40, 692 P.2d 846 (1984).

The trial court's unchallenged findings permit consideration of the following circumstances on the question of probable cause: Shortly before hearing the robbery report, Officer Weklych noticed a "black Volkswagen–type" car drive somewhat erratically into the Geisha Inn parking lot. The initial robbery report indicated only that the suspects were a black male and black female and were last seen driving a "black Volkswagen Rabbit" eastbound on 205th. Although the Geisha Inn is located several miles south of

the robbery scene, Aurora Avenue is a "main thorough-fare."

A subsequent radio report indicated that the suspect car was "a newer black Rabbit or BMW–type car," that both occupants were wearing sunglasses, and that the female was driving. From the motel clerk, Officer Weklych learned that the occupants of the black car had been nervous and excited, looking out of the door and window several times. The female, who had been driving the car, was wearing sunglasses. The man, whose weight corresponded to the broadcast description, "showed a large sum of money in mostly small bills."

Finally, when Ms. Leasure emerged from room 6 and saw one of the officers, she immediately turned around and shouted "police," a highly suspicious circumstance. After listening to Officer Weklych's explanation of the investigation, Ms. Leasure stated, "I just lent the car out," a response that, at the very least, indicated the possible involvement of the car in the robbery.

We conclude that when all of these circumstances, including the proximity of the encounter in time and location to the robbery scene, the suspects' nervousness while checking in, and the correspondence of certain details, *i.e.,* sex and race of the suspects, sunglasses, and wad of bills, are viewed in their entirety, there was substantially more here than a "bare suspicion" and enough to warrant "a person of reasonable caution" in believing that Flowers had committed the crime.

Our conclusion that there was probable cause, however, does not end the inquiry. The propriety of the warrantless "entry" and arrest is a separate question. *See State v. Terrovona, supra* at 644. Generally, the Fourth Amendment "prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a *routine* felony arrest without exigent circumstances." (Italics ours.) *Seattle v. Altschuler,* 53 Wn. App. 317, 319, 766 P.2d 518 (1989) (hot pursuit or fleeing suspect did not constitute exigent circumstances justifying warrantless entry into

home to make an arrest for traffic violation); *see also Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980); *State v. Machado,* 54 Wn. App. 771, 775 P.2d 997 (1989) (warrantless entry into apartment to arrest robbery suspect justified by exigent circumstances), *review denied,* 114 Wn.2d 1009 (1990); *see generally* Utter, *Survey of Washington Search and Seizure Law: 1988 Update,* 11 U. Puget Sound L. Rev. 411, 506 (1988).

▋ In determining whether exigent circumstances justify a warrantless entry and arrest of a felony suspect, the courts in this state have identified a number of relevant factors:

> (1) a grave offense, particularly a crime of violence, is involved; (2) the suspect is reasonably believed to be armed; (3) there is reasonably trustworthy information that the suspect is guilty; (4) there is strong reason to believe that the suspect is on the premises; (5) the suspect is likely to escape if not swiftly apprehended; and (6) the entry is made peaceably.

*State v. Terrovona, supra* at 644 (citing *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970)). The *Dorman* factors are not exclusive and have been supplemented with additional factors:

> (1) hot pursuit; (2) fleeing suspect; (3) danger to arresting officer or to the public; (4) mobility of the vehicle; and (5) mobility or destruction of the evidence.

*Terrovona,* at 644 (citing *State v. Counts,* 99 Wn.2d 54, 60, 659 P.2d 1087 (1983)); *see also Seattle v. Altschuler, supra* at 320. Yet another "factor" is whether the arrest is planned or unplanned. *See generally* 2 W. LaFave, *Search and Seizure* § 6.1(f), at 599 (2d ed. 1987).

Here, the exigent circumstances justified the warrantless "entry." Robbery is a "grave offense" and the police officers reasonably believed the suspects to be armed and willing to use a gun. *See State v. Machado, supra* at 776. The rapidly unfolding situation presented a potential danger to the investigating officers, the suspects, and the public. Once Flowers had been alerted to the officers' presence, the possibility that some evidence might be destroyed was

increased. The "entry" here was peaceable and less intrusive than had the police physically entered the room to arrest the suspect. Finally, the officers did not intend to arrest the occupants of room 6 when the investigation began. *See State v. Machado, supra.* The fact that some of the factors are not present in an individual case is not controlling.

In summary, given the presence of numerous exigent circumstances, the police "properly chose to defuse the potentially dangerous situation by entering immediately." *State v. Machado, supra* at 777. While the police may not manufacture their own exigent circumstances in order to justify a warrantless entry and arrest, this was not the case here. *Cf. State v. Hall,* 53 Wn. App. 296, 302, 766 P.2d 512 (possibility that someone in jail and within police control might telephone the defendant did not constitute exigent circumstances justifying warrantless entry to secure home against destruction of evidence), *review denied,* 112 Wn.2d 1016 (1989). Because we conclude that probable cause and exigent circumstances justified the trial court's decision, we need not determine whether the officers' actions were also justified by reasonable suspicion and exigent circumstances.

Flowers next contends that even if the initial detention was valid, the trial court nonetheless erred in finding that he voluntarily and knowingly consented to the search of his room. The trial court found as follows on the consent issue:

> Officer Emerick asked Mr. Flowers if the officers could look through the room and the car. Mr. Flowers said, "Sure, go ahead." At this time, Mr. Flowers had been told the reason for the stop. He was still on the ground, but Officer Lobb had removed his knee from Mr. Flowers' spine. He was still holding Mr. Flowers' fingers. Officer Emerick relayed the consent to the other officers who then searched the room. Mr. Flowers did not react to Officer Emerick's statement that they had consent to search.

Finding of fact B(2).

A warrantless search is constitutional when based on valid consent. In order to be valid, consent must, among other things, be voluntary. *State v. Shoemaker,* 85 Wn.2d

207, 210, 533 P.2d 123 (1975). Whether consent is freely given is a factual question that depends on the totality of the circumstances; the State has the burden of showing by "clear and convincing evidence that the consent was informed and given freely and voluntarily." *State v. Mak,* 105 Wn.2d 692, 713, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986). Factors generally recognized as bearing on the issue of consent include:

> (1) whether *Miranda* warnings had been given prior to obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person had been advised of his right not to consent.

*State v. Shoemaker, supra* at 212. "These factors should be judiciously balanced against each other with no particular factor necessarily being dispositive." *Shoemaker,* at 212. Additional factors that may affect the voluntariness of consent include express or implied claims of authority to search, prior illegal police action, prior cooperation or refusal to cooperate, and police deception as to identity or purpose. *See* Utter, *Survey of Washington Search and Seizure Law: 1988 Update, supra* at 551–56.

The circumstances surrounding the oral consent appear, at first blush, coercive. Appellant was ordered out of his room at gunpoint by several officers. He was then ordered to kneel with his hands behind his head; one officer "placed a leg between Mr. Flowers' knees and placed a knee on Mr. Flowers' spine to restrain him." Shortly after being "contained," Flowers was then asked for permission to search the room and car. He was not given his *Miranda* rights at this time, nor was he advised of his right to withhold consent. Individually, factors such as a failure to give *Miranda* warnings or to advise a suspect of the right to withhold consent, custodial restraint, and the display of weapons by several police officers, do not necessarily preclude a finding of voluntariness. The presence of all of these factors, however, is significant and indicative of coercion. *See, e.g., State v. Werth,* 18 Wn. App. 530, 571 P.2d 941 (1977) (defendant's verbal consent, given after she was ordered out

of house at gunpoint, not advised of right to withhold consent, and 2 days after police had illegally searched the house, was not voluntary), *review denied,* 90 Wn.2d 1010 (1978). *But cf. State v. Rodriguez,* 20 Wn. App. 876, 582 P.2d 904 (1978) (consent to search voluntary where given after defendant arrested and handcuffed, no *Miranda* warnings given, defendant not advised of right to refuse consent, and defendant denied giving oral consent).

The coercive factors present here must be viewed in light of the other circumstances. Flowers took the stand at the suppression hearing and acknowledged that he knew what "legal consent to search" meant and that no one had threatened to get a search warrant if he did not consent. It is evident from Flowers' testimony that he is neither of low intelligence nor totally naive in criminal matters.[1] Flowers made no contention that he felt coerced by the encounter with police officers or that he did not understand he could withhold consent. *See State v. Rodriguez, supra* at 880 (request for permission to search carries with it implication that person can withhold permission). Rather, he steadfastly maintained that no one had asked for his consent and that the officers who had so testified were lying. Consequently, the trial court's resolution of the consent issue rested heavily on an assessment of the parties' credibility, a factor resolved in favor of the police officers. *See State v. Rodriguez, supra* at 879.

After reviewing the entire record, including Flowers' testimony and the unchallenged finding that Flowers gave his oral consent after being informed of the nature of the investigation, we can find no indication that Flowers' consent was the product of coercion or duress or that his "will

---

[1] At one point, when questioning involved his reaction to the officers' explanation of the investigation, Flowers replied, "I plead the Fifth to that question."

was overborne." We agree with the trial court that the State has satisfied its burden of demonstrating the consent was free and voluntary.

*State v. Werth, supra,* relied upon by appellant, is distinguishable. In *Werth,* police officers illegally entered the defendant's home to search for a prison escapee. Two days later, the officers returned and ordered the defendant out of her home. The defendant saw at least one officer with a weapon and claimed that she was frightened. The testimony was disputed as to whether the defendant was asked and had given oral consent to search. The trial court ruled that the first search was illegal, but that the defendant had voluntarily consented to the second search.

We reversed, holding that even if the defendant had verbalized her consent, the State had failed to sustain its burden of demonstrating that the consent resulted from the defendant's free choice. *Werth,* at 535. In reaching this decision, we cited as coercive factors the custodial restraint, show of force or authority by several officers, a failure to inform the defendant of the right to refuse consent, and— of particular significance—the prior illegal search of the defendant's home.

Several of the coercive factors relied upon in *Werth* are also present here. Unlike *Werth,* however, there was no illegal search preceding the consent. Moreover, in the instant case, appellant has not challenged the trial court's findings that the officers explained to him the purpose of the investigation and that he was asked for and gave his oral consent to search.

In light of Flowers' testimony at the suppression hearing and the unchallenged findings, there is no basis in this record for concluding, as did the court in *Werth,* that there was "little question that, in [the defendant's] own mind,

police were going to search her home with or without her consent." *Werth,* at 535.

Judgment affirmed.

COLEMAN, C.J., and PEKELIS, J., concur.

Review denied at 115 Wn.2d 1009 (1990).