**STATE of Utah, Plaintiff and Appellee,**

v.

**Rodney Donald CARTER, Defendant and Appellant.**

**No. 900303–CA.**

Court of Appeals of Utah.

May 28, 1991.

Ronald J. Yengich (argued), Yengich, Rich, Xaiz & Metos, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., Judith S. H. Atherton (argued), Salt Lake City, for plaintiff and appellee.

## AMENDED OPINION *

Before BILLINGS, GARFF and ORME, JJ.

* This opinion replaces the opinion of the same name issued on March 20, 1991.

BILLINGS, Judge:

Defendant Rodney Donald Carter appeals his conviction of possession of a controlled substance with intent to distribute, a second degree felony, in violation of Utah Code Ann. § 58-37-8(1)(iv) (1990). Defendant filed a pretrial motion to suppress cocaine seized from his person, claiming narcotics agents had violated his rights under article I, section 14 of the Utah Constitution and the fourth amendment of the United States Constitution. The trial court denied the motion and defendant was convicted following a bench trial. We reverse.

Because the legal issues surrounding the seizure of contraband are highly fact sensitive, we recite the facts in detail. *State v. Marshall*, 791 P.2d 880 (Utah Ct.App.), *cert. denied*, 800 P.2d 1105 (Utah 1990). On July 17, 1989, at approximately 5:15 p.m., Detective Bart Palmer (Palmer) of the Salt Lake County Sheriff's Office and Lieutenant Dave Fullmer (Fullmer) of the Utah State Narcotics Agency, dressed in street clothes, were observing passengers deplaning from an America West flight arriving from Los Angeles via Las Vegas, in an effort to locate drug couriers. The officers noticed defendant as he carried a duffel bag and scanned the area but did not appear to be looking for anyone in particular or reading signs for directions. As defendant walked up the concourse, he looked back in the direction of the officers three times. The officers continued to observe defendant, losing visual contact briefly, but then noticing him enter a bank of pay telephones. Palmer entered the cubicle next to defendant, but was unable to hear defendant speak during the short time defendant was in the telephone area.

After hanging up the telephone, defendant walked to the escalator and then quickened his pace, walking past other people, as he rode down to the main level of the airport. Maintaining his fast pace, defendant exited the terminal and went to the cab stand just outside the main doors. While Fullmer exited through another set of doors, Palmer followed defendant and

approached defendant after he had placed his bag in a taxi and was about to enter the taxi.

Palmer identified himself as a police officer and asked if defendant would talk with him. Defendant agreed and removed his bag from the taxi. Palmer and defendant moved to a public area outside the airport terminal about twenty feet from where the taxi had been parked. Palmer then asked to see defendant's airplane ticket and defendant indicated he thought he had left it on the airplane, but produced his recent ticket from Salt Lake to Las Vegas for Palmer to examine. Palmer examined the ticket and returned it.

Fullmer arrived near the scene as Palmer was asking defendant for identification. Defendant indicated he did not have any, but proceeded to look in his bag for identification pursuant to Palmer's request. As he bent over to look in his bag, Fullmer noticed a line protruding through defendant's shirt. Palmer then indicated he was a narcotics officer and asked defendant if he could search his bag. Defendant agreed. As Palmer began searching defendant's bag, Fullmer asked defendant if he could search his person. Defendant responded "go ahead" and turned his back to Fullmer.

During a pat-down search, Fullmer detected two bulges in defendant's lower abdominal area and asked what they were. Defendant did not answer. Fullmer asked if he could see the bulges and again defendant did not respond verbally, but this time he lifted his shirt revealing masking tape around his midsection going down into his pants. When asked the purpose of the tape, defendant indicated he had injured his ribs.

The tape was below defendant's ribs starting near his waistline and continuing into his pants. Fullmer testified he then asked defendant if he could see the rest of the tape, and defendant responded that he could, but stated he would rather not do so in the public area of the airport. Fullmer suggested going to the airport office just inside the terminal doors. Defendant agreed and the three proceeded inside.

Once in the airport office, defendant refused an invitation to sit and told the officers "you've got me, you might as well have this," revealing the packages on his lower abdomen which contained cocaine. Defendant was then arrested.

Defendant claims his rights under article I, section 14 of the Utah Constitution and the fourth and fourteenth amendments of the United States Constitution were violated. Defendant argues the police did not have a reasonable and articulable suspicion to detain him and that he did not voluntarily consent to the search of his person.[1]

Initially, the state responds that the exchange between the officers and defendant was a constitutionally permissible voluntary encounter. The state continues that when the encounter advanced to the point where defendant did not feel free to leave, at this point the trial court found reasonable suspicion to believe he was involved in transporting drugs, and that all searches were pursuant to defendant's voluntary consent. In order to resolve the legal issues presented in this appeal, we deal with whether there was reasonable suspicion to detain defendant and whether his consents to the curbside searches of his person were both voluntary and sufficiently attenuated from any prior illegality to justify the searches.

1. Although defendant argues that article I, section 14 of the Utah Constitution provides greater protection from unlawful search and seizure than the fourth amendment, he does not offer a specific analysis, but merely cites *State v. Larocco*, 794 P.2d 460 (Utah 1990), for the conclusory proposition that Utah has abandoned "tailgating" Supreme Court cases. While *Larocco* did diverge from previously identical state and federal search and seizure analyses in Utah, it did so specifically in the area of automobiles. De-

fendant offers no rationale as to why our analysis of the issues in the instant case should likewise diverge from the federal analysis. Where a defendant fails to support his state constitutional argument with analysis or legal authority, this court will not address it. *State v. Marshall*, 791 P.2d 880, 883 n. 4 (Utah Ct.App.), *cert. denied*, 800 P.2d 1105 (Utah 1990). Accordingly, we do not engage in an independent state constitutional analysis under article I, section 14 of the Utah Constitution.

## NATURE OF POLICE ENCOUNTER

■ In *State v. Deitman*, 739 P.2d 616 (Utah 1987), the Utah Supreme Court recognized three levels of police-citizen encounters and the circumstances under which they are constitutionally permissible.

(1) an officer may approach a citizen at anytime and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.

*Id.* at 617–18 (quoting *United States v. Merritt*, 736 F.2d 223, 230 (5th Cir.1984)); *see also State v. Jackson*, 805 P.2d 765, 766–67 (Utah Ct.App.1990); *State v. Smith*, 781 P.2d 879, 881 (Utah Ct.App.1989).

■ The first level of encounter, a "level one" encounter, encompasses situations where an officer approaches an individual and poses questions to the individual, so long as the individual is not detained against his will. This court recently stated "[a]s long as the person 'remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.'" *Jackson*, 805 P.2d at 767 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).

In *State v. Trujillo*, 739 P.2d 85, 87 (Utah Ct.App.1987) (citing *Mendenhall*, 446 U.S. at 544, 100 S.Ct. at 1870), we noted that "when a reasonable person, based on the totality of the circumstances, remains, not in the spirit of cooperation with the officer's investigation, but because he believes he is not free to leave, a seizure occurs." *See also State v. Smith*, 781 P.2d 879, 881 (Utah Ct.App.1989) (quoting *Trujillo*, 739 P.2d at 87). In other words, a seizure occurs where an officer by show of authority or physical force in some way restricts the liberty of an individual. *Trujillo*, 739 P.2d at 87 (citing *Mendenhall*, 446 U.S. at 553, 100 S.Ct. at 1876).

■ Generally, a seizure does not occur where an officer simply approaches an individual in public, asks questions, and even requests identification. *See, e.g., Deitman*, 739 P.2d at 618; *Jackson*, 805 P.2d at 766–67; *Trujillo*, 739 P.2d at 88. Standing alone, the fact that an officer identifies himself as a police officer does not convert a consensual encounter into a seizure. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).

This court has recognized circumstances that, when considered in light of all other circumstances, tend to indicate a seizure has occurred: (1) the presence of several uniformed officers; (2) the display of a weapon by an officer; (3) physical touching of the individual; and (4) the use of language or voice tone threatening to the individual. *Jackson*, 805 P.2d at 767, (citing *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1876).

Other courts have looked to additional factors in evaluating the nature of an encounter. These factors include the length of an interview, blocking an individual's path, retaining an individual's travel ticket, the removal of the defendant to a private area, statements by police that an investigation has focused on the individual, or searching the defendant's belongings or person. *See United States v. Gonzales*, 842 F.2d 748, 751–52 (5th Cir.1988), *overruled on other grounds*, 905 F.2d 74 (5th Cir.1990).

Utah cases are not dispositive on the issue of what constitutes a seizure for fourth amendment purposes in the context of an airport stop. We therefore review a number of insightful federal cases which have treated this topic. In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a plurality of the United States Supreme Court upheld the determination of the state appellate court that defendant was not free to leave where he was "confined" in a small area at an airport with

two undercover narcotics agents who had indicated defendant was suspected of transporting narcotics. In upholding the trial court's decision, the Court cautioned that because circumstances could vary endlessly, there was no "litmus paper" test for distinguishing airport consensual encounters from seizures. *Id.* at 506, 103 S.Ct. at 1329.

In *Gonzales*, the fifth circuit was faced with a situation involving a defendant stopped in an airport by two undercover narcotics agents who identified themselves as such and asked to look in the gym bag defendant was carrying. The court concluded that although the encounter was initially a voluntary encounter, it escalated into a seizure when the officer informed defendant he was "working narcotics" and asked to look in her bag. The court reasoned that at that time "a reasonable person would no longer have felt free to leave." 842 F.2d at 752.[2]

Again in *United States v. Galberth*, 846 F.2d 983 (5th Cir.), *cert. denied*, 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988), the fifth circuit addressed a situation where a defendant was stopped by undercover narcotics officers at an airport. The court noted that the initial encounter with defendant was permissible where the stop was non-coercive, and defendant's identification and ticket were returned to her shortly after they were examined by the officers. The court further concluded that a consensual search of defendant's handbag did not convert the encounter into a fourth amendment seizure where the interview was conducted in public, no coercion was involved, and the officers did nothing to lead defendant to believe she was not free to leave. The court did note, however, that when the officers then requested that the defendant submit to a pat-down search, a seizure occurred requiring reasonable suspicion. *See id.* at 990 n. 11.

In *United States v. Poitier*, 818 F.2d 679 (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988), the court concluded no seizure occurred where two undercover narcotics agents stopped a deplaning passenger, identified themselves, requested defendant's identification, and suggested moving to a quieter location. The court concluded, however, that the encounter escalated into a seizure when the officers stated they suspected defendant of carrying drugs and read defendant her *Miranda* rights, because at that point a reasonable person would not have felt free to leave.

In the instant case, two narcotics officers dressed in plain clothes approached defendant while he was getting into a taxi and asked to speak to him. They directed him to a location about twenty feet from the taxi area. The record does not reflect that the officers carried any visible weapons or acted in an intimidating manner. Palmer, the officer who initially approached defendant, asked defendant for his ticket and identification, and after receiving a ticket returned it. Palmer then identified himself as a narcotics officer and asked to look in defendant's bag. Immediately after defendant agreed to allow Palmer to search his bag, Fullmer asked defendant if he could search defendant's person, and after defendant agreed, conducted a pat-down search of his person.

**2.** On similar facts, the United States Court of Appeals for the District of Columbia, applying the objective "free to leave" standard, concluded a defendant was not seized for fourth amendment purposes where an undercover narcotics officer stationed at a transportation center identified himself as such, asked for and returned identification and tickets, and then asked to search defendant's bags. *See United States v. Smith*, 901 F.2d 1116 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990); *see also United States v. Maragh*, 894 F.2d 415 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).

Recently, another court that had previously adopted the *Maragh* approach held that a defendant was seized, as a reasonable man would not have felt free to leave where he had been approached at a train station by narcotics agents who questioned him, asked to search his bag, allowed him to leave, and then stopped him about fifteen minutes later and asked to do a body search of defendant and his companion. *See Guadalupe v. United States*, 585 A.2d 1348 (D.C.Ct.App.1991).

In ruling on defendant's motion to suppress the cocaine obtained in the subsequent search of defendant's person, the trial judge carefully articulated exactly when he found the officers had reasonable suspicion to believe defendant was engaged in criminal conduct, but the judge did not address the precise issue of whether or when the encounter progressed to a level two seizure. Thus, we have no determination to review.[3] Instead, the judge focused solely on the issue of defendant's consents to search and whether defendant's consents were voluntary.[4]

■ Although the judge found defendant voluntarily consented to both the search of his bag and his person, this was not the necessary inquiry. Indeed, it is easy to conceive a situation where an individual involved in an encounter with the police would not feel free to leave but nevertheless would "voluntarily" consent to a search during his seizure. While the tests for evaluating the voluntariness of consent to search and the nature of an encounter are similar and may overlap, they are not identical and merit separate consideration. *See United States v. Maragh*, 894 F.2d 415, 420 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).

In light of the authority we have reviewed, and based upon the factual record before us, we believe a reasonable person would not have felt free to leave at the point where defendant had been stopped and detained by two men who identified themselves as narcotics officers and one officer requested to search his person after the other had already begun searching his belongings. We therefore conclude that defendant was seized for purposes of the fourth amendment *at least* at the point where Fullmer asked to conduct a pat-down search of defendant. *See State v. Trujillo*, 739 P.2d 85, 88 (Utah Ct.App.1987).

## REASONABLE SUSPICION

■ Our inquiry does not end with our conclusion that defendant's encounter with the officers escalated into a seizure or a

3. The parties do not refer us to, nor were we able to locate any prior Utah authority defining the precise standard to be employed in appellate review of a trial court's determination of when a seizure occurs. Although we need not apply a standard of review in this case because of the trial court's failure to address the specific issue of when a seizure occurred, we note that a trial court's ultimate determination of whether on particular facts an encounter amounts to a seizure under the fourth amendment has been held to be a legal conclusion and thus afforded no deference on appeal, but reviewed under a correction of error standard. *See United States v. Maragh*, 894 F.2d 415, 417 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990) ("It does not matter that *Mendenhall* requires the courts to consider whether a reasonable person would have felt free to leave 'in view of all the circumstances surrounding the incident.' Although *Mendenhall's* seizure test 'is necessarily imprecise' and 'flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, *it calls for consistent application from one police encounter to the next,* regardless of the particular individual's response to the actions of the police.' *De novo* review helps to ensure 'consistent application.' ") (citations omitted).

We find this approach analytically sound. Although the factual circumstances articulated in findings which lead to the ultimate determination that a seizure has occurred should be afforded great deference, treating the determination that a seizure has occurred as a factual finding would result in trial judges merely making one finding—"the defendant was seized."

We note, however, that we see no analytical distinction among a trial court's determinations of when a seizure occurs, of reasonable suspicion, or of voluntary consent for purposes of the applicable standard of review. Thus, one could argue that since prior Utah authority, as well as substantial authority from other state and federal jurisdictions, has treated reasonable suspicion and voluntary consent as factual determinations to be reviewed under a clearly erroneous standard, we must adopt that standard to review a determination of if or when a seizure occurred. *See infra* notes 6 & 8.

4. The trial court found "defendant freely and voluntarily consented to the police requests at least through the point of his voluntarily raising his shirt and disclosing to the police the masking tape that was bound around his body." We understand this determination to be directed to defendant's several consents to search rather than to the issue of seizure. However, even if we were to stretch to translate this as a determination that the defendant remained throughout the encounter "in the spirit of cooperation with the officers' investigation," not because of the officers' "show of authority," we would find the determination error under either a correction of error or a clearly erroneous standard.

level two stop. We must now determine whether defendant's temporary detention was justified, that is, whether it was supported by a reasonable articulable suspicion to believe he was engaged in criminal activity. *See State v. Trujillo*, 739 P.2d 85, 88 (Utah Ct.App.1987) ("[i]n order to justify this seizure, Officer ... must point to specific, articulable facts which, together with rational inferences drawn from those facts, would lead a reasonable person to conclude [defendant] had committed or was about to commit a crime."); *see also Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968).

In the instant case, the trial judge expressly stated that there was no reasonable suspicion to believe defendant was transporting narcotics at the time the officers conducted a pat-down search of his person. Specifically, the trial judge states:

1. The Court specifically discredits the officers ability to form a reasonable articulate suspicion prior to the time of the defendant's failure to provide an identification upon request.

2. The Court concludes that the absence or the failure of the defendant to produce identification also was not by itself, or in the aggregate with the previously listed factors, sufficient to indicate a reasonable articulable suspicion.

3. The Court further concludes that the officer's perception of a line just at or above the defendant's waist, but under his outer clothing, was not a reasonable articulable suspicion by itself or in combination with anything previously noted.[5]

4. The Court further concludes that the pat down search and observations made by the officers, including the feeling of the bulge, at that time was not sufficient to constitute a reasonable suspicion either alone or in the aggregate.

On appeal, the state does not challenge the trial judge's findings or conclusions as to reasonable suspicion, and we find no error in them.[6] Accordingly, we conclude

---

**5.** This conclusion does not specifically deal with the officer's testimony that he had "on numerous occasions over [his] fourteen years in this business seen narcotics taped to people's midsections and back and sides," and thus his expressed concern that the line *"might"* be tape securing narcotics. Although the officer's testimony is certainly relevant to a determination of reasonable suspicion, the officer also testified he "definitely didn't know exactly what [the line] was," and it could just as likely have been "shorts or something else." The trial court was able to observe the demeanor of the officer testifying and could have properly determined that his preliminary suspicions were still more in the nature of a "hunch" and had not risen to the requisite level of reasonable suspicion. This probably explains why the state does not challenge this determination on appeal and is why we find no error in it either.

**6.** Because the state has not challenged the trial judge's determinations as to reasonable suspicion, we have not focused on the appropriate standard of review we should apply in reviewing them. The trial judge labeled his determinations on reasonable suspicion as "conclusions of law." Generally, we review conclusions of law under a correction of error standard. *See State v. Palmer*, 803 P.2d 1249, 1251 (Utah Ct.App. 1990).

Again, however, we are puzzled by what standard of review we should apply in reviewing a trial court's determination of reasonable suspicion. The Utah Supreme Court has previously treated a determination of reasonable suspicion as a factual finding, indicating that determinations of reasonable suspicion are properly reviewed by appellate courts under a clearly erroneous standard. *See State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987) ("In determining whether the facts support a reasonable suspicion ..., a trial court must consider the totality of the circumstances facing the officers. The reviewing court should not overturn the trial court's determination unless it is clearly erroneous.") (citations omitted). This court has followed the supreme court's directive and has applied the clearly erroneous standard in comparable situations. *See, e.g., State v. Grovier*, 808 P.2d 133, 137 n. 1 (Utah Ct.App.1991) (applying clearly erroneous standard to review determination that reasonable suspicion existed); *State v. Robinson*, 797 P.2d 431, 435 (Utah Ct.App.1990) (whether reasonable suspicion existed to justify an investigatory detention presents a question of fact reviewable under a clearly erroneous standard); *State v. Sery*, 758 P.2d 935 (Utah Ct.App.1988) (whether seizure supported by reasonable suspicion reviewed under clearly erroneous standard).

Analytically, however, we are inclined to agree with the trial court that a determination of reasonable suspicion more logically falls into the conclusion of law category. *See supra* note 3 and *infra* note 8; *see also Hayes v. State*, 785 P.2d 33, 36 (Alaska Ct.App.1990) (reasonable suspicion is mixed question, factual findings upheld unless clearly erroneous, but ultimate conclusion is subject to *de novo* review).

defendant was unreasonably seized in violation of the fourth amendment.

## CONSENT

Nevertheless, we continue our inquiry as the state contends defendant's voluntary consent to the requested pat-down search purged any prior violation of his fourth amendment rights. Although a warrantless search is generally violative of the fourth amendment, it is well settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *see State v. Arroyo*, 796 P.2d 684, 687 (Utah 1990); *State v. Marshall*, 791 P.2d 880, 887 (Utah Ct.App.), *cert. denied*, 800 P.2d 1105 (Utah 1990).

■ In determining whether a consent to search is lawfully obtained following a fourth amendment violation, a two prong test must be met for the evidence to be admissible: "(1) the consent must be voluntary in fact; and (2) the consent must not be obtained by police exploitation of the prior illegality." *State v. Robinson*, 797 P.2d 431, 437 (Utah Ct.App.1990) (citing *Arroyo*, 796 P.2d at 688). The state carries the burden of proving both prongs of the test. *See Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045; *Arroyo*, 796 P.2d at 687; *State v. Webb*, 790 P.2d 65, 82 (Utah Ct. App.1990).

### A. *Voluntariness*

■ Voluntariness of consent is a fact sensitive issue to be determined by examining the totality of the circumstances. *See Marshall*, 791 P.2d at 887; *Webb*, 790 P.2d at 82 (citing *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980)). This includes the specific characteristics of the accused and the details of the police conduct involved. *Arroyo*, 796 P.2d at 689.

In *Marshall*, this court set forth the standard previously adopted by the tenth circuit for determining whether the government had sustained its burden of proving voluntary consent.

(1) There must be clear and positive testimony that the consent was "unequivocal and specific" and "freely and intelligently given"; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

791 P.2d at 887–88 (quoting *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir. 1977)); *Webb*, 790 P.2d at 82.[7]

■ The Utah Supreme Court has provided some guidance as to what factors may indicate a lack of coercion, including: "1) absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the owner ...; and 5) the absence of decep-

---

**7.** The state claims the burden of proof needed to establish voluntary consent is only a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) (reviewing voluntariness of consent to warrantless search "controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *United States v. Hurtado*, 905 F.2d 74 (5th Cir.1990) (rejecting previous clear and convincing standard and adopting preponderance standard when examining voluntariness of consent to search); *United States v. Chaidez*, 906 F.2d 377 (8th Cir.1990) (using preponderance standard); *People v. Harris*, 199 Ill.App.3d 1008, 146 Ill.Dec. 90, 557 N.E.2d 1277 (1990); *State v. Cress*, 576

A.2d 1366 (Me.1990); *State v. O'Dell*, 576 A.2d 425 (R.I.1990).

We agree with the state that this court has not precisely dealt with the issue of the proper burden of proof required to prove voluntary consent. The use of the general standard from *Abbott* in *Marshall* and *Webb* was not directed to the burden of proof issue. The burden of proof to prove voluntary consent was not directly at issue in either case. Furthermore, we do not find it necessary to decide the burden of proof issue today as the evidence presented to the trial court demonstrates that defendant voluntarily consented, in fact, to the searches which led to the discovery of the cocaine under either a preponderance or a clear and convincing standard.

tion or trick on the part of the officer." *State v. Whittenback,* 621 P.2d 103, 106 (Utah 1980). It is also noteworthy that the government is not required to prove the defendant knew of his right to refuse consent in order to prove voluntariness. *Id;* *see also Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047 (not required to prove knowledge of right to refuse, but a factor to consider in evaluating voluntariness).

Defendant initially claims that his consent to the search of his body was not voluntary because he was in the presence of two plain clothes officers and was not informed of his right not to consent. He cites no authority for this proposition. The trial judge found that "the defendant free-

ly and voluntarily consented to the police requests at least through the point of his voluntarily raising his shirt." Defendant has failed to direct us to any facts in the record contrary to this determination. There is nothing in the record to indicate overreaching or coercion by the officers in obtaining defendant's consent to lift his shirt which resulted in the discovery of the taped bulges around his waist and the ultimate removal of their contents. This consent did occur after we have found defendant was unlawfully seized. However, there is substantial support in the record for the trial court's determination that defendant, as a matter of fact, freely and voluntarily consented to raise his shirt.[8]

---

**8.** We need not decide the precise standard to apply in reviewing the trial court's determination of voluntary consent because we find the determination correct under either a correction of error standard, commonly utilized when reviewing legal conclusions, or a clearly erroneous standard, as commonly used when reviewing factual findings. However, we are concerned about the mixed signals this court has given when dealing with the issue of what the appropriate standard of review is to review a determination of voluntary consent.

Prior cases from the Utah Supreme Court have seemed to treat a finding of voluntary consent as a factual finding. *See, e.g., State v. Arroyo,* 796 P.2d 684 (Utah 1990) (finding of fact not to be set aside unless clearly erroneous, but here "trial court's finding of consent [was] clearly erroneous"); *State v. Whittenback,* 621 P.2d 103, 106 (Utah 1980) (applying totality of circumstances test to evaluate consent). This is consistent with authority from other state and federal jurisdictions. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973) ("Voluntariness [of consent] is a question of fact to be determined from all the circumstances...."); *United States v. Baskin,* 886 F.2d 383, 387 (D.C.Cir.) (trial court's "conclusion" that defendant voluntarily consented subject to clearly erroneous standard), *cert. denied,* —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990); *United States v. Galberth,* 846 F.2d 983, 987–88 (5th Cir.) (determination of voluntary consent subjected to clearly erroneous standard), *cert. denied,* 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988); *United States v. Borys,* 766 F.2d 304, 314–15 (7th Cir. 1985) (applying clearly erroneous standard), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986); *United States v. Recalde,* 761 F.2d 1448, 1457 (10th Cir.1985) (applying clearly erroneous standard); *People v. Carlson,* 677 P.2d 310, 318 (Colo.1984) (voluntariness is a question of fact); *State v. Ruden,*

245 Kan. 95, 774 P.2d 972, 979 (1989) (voluntariness is question of fact to be reviewed under clearly erroneous standard); *State v. Flowers,* 57 Wash.App. 636, 789 P.2d 333 (whether consent was freely given is a factual question), *review denied,* 115 Wash.2d 1009, 797 P.2d 511 (1990); *Pena v. State,* 792 P.2d 1352, 1358 (Wyo.1990) (voluntariness is question of fact).

Until recently, this court had also followed a similar approach. *See, e.g., State v. Marshall,* 791 P.2d 880, 887 (Utah Ct.App.1990) ("question of whether consent to a search was in fact 'voluntary' ... is a question of fact to be determined from the totality of all the circumstances"), *cert. denied,* 800 P.2d 1105 (Utah 1990); *State v. Webb,* 790 P.2d 65, 82 (Utah Ct.App.1990) (voluntariness of consent is a question of fact to be disturbed "only if the appellant demonstrates there has been clear error").

Recently, however, a panel of this court adopted a two-prong analysis for reviewing voluntary consent to search in *State v. Bobo,* 803 P.2d 1268, 1272 (Utah Ct.App.1990) (Judges Greenwood, Jackson, and Orme). In *Bobo,* the panel set out a two-part standard to employ when reviewing a trial court's determination of voluntary consent. "[T]he factual findings leading to the trial court's determination that defendant voluntarily consented to the search of his home are considered for clear error and the legal conclusion of voluntary consent premised upon those facts is examined for correctness." *See id.* (citing *Oates v. Chavez,* 749 P.2d 658, 659 (Utah 1988)). This approach was followed in *State v. Hargraves,* 806 P.2d 228, 231–32 (Utah Ct.App.1991) (Judges Bench, Billings, and Greenwood).

Subsequently, however, this court has returned to reviewing a determination of voluntary consent under a clearly erroneous standard. *See, e.g., State v. Grovier,* 808 P.2d 133, 137 n. 1 (Utah Ct.App.1991) (Judges Bench, Jackson, and Russon) (expressly rejecting the *Bobo* approach and reviewing voluntary consent

## B. *Taint of Illegal Detention*

Defendant nevertheless argues that his consent to raise his shirt displaying the taped packages was invalid as, even if it was voluntary, it was the product of an illegal seizure. Defendant argues, and we have previously agreed, that he was illegally seized at the time the pat down search of his person was requested. Even where the government proves the consent is voluntary, such consent cannot justify a search if the otherwise voluntary consent was obtained through the exploitation of an antecedent police illegality. *Arroyo*, 796 P.2d at 690–91. Thus, if an antecedent police illegality exists, the government must establish that the otherwise voluntary consent is sufficiently attenuated to have purged the taint of the original police illegality. *Id.*

In *Arroyo*, the Utah Supreme Court recognized several factors that merit consideration when determining if consent was obtained as a result of an exploitation of a prior illegality. These factors include *Miranda* warnings, temporal proximity of the illegality and the consent, the presence of intervening circumstances, and the flagrancy of the illegality. *See id.* at 690–91 & n. 4. (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), and 3 W. LaFave, *Search and Seizure* § 8.2(d), at 193–94 (2d ed. 1987)); *see also State v. Sims*, 808 P.2d 141, 149–52 (Utah Ct.App.1991).

In the instant case, the trial judge ruled on defendant's motion to suppress prior to the Utah Supreme Court's adoption of the "exploitation of the prior illegality" analysis for evaluating consent to search in *Arroyo*. Under then existing Utah case law, no such independent exploration was required. *See State v. Sierra*, 754 P.2d 972, 974 (Utah Ct.App.1988), *overruled*, 796 P.2d 684 (Utah 1990). Thus, neither counsel nor the trial judge had the benefit of the supreme court's analysis. Therefore, the trial judge did not address the issue of whether defendant's consent was sufficiently attenuated from what we have determined on appeal to be an illegal detention.

However, the state of our record does not necessitate remand for findings directed at this issue. The undisputed facts in

to search as only a question of fact); *State v. Sterger*, 808 P.2d 122, 126–27 n. 5 (Utah Ct.App. 1991) (Judges Bench, Jackson and Russon). Since several of the judges concurring in *Bobo* and *Hargraves* have since returned to the clearly erroneous standard, it may be that they, like the author, have only recently focused on the issue.

Although the great weight of authority supports treating a determination of voluntary consent as a factual finding, we find the bifurcated approach articulated in *Bobo* analytically sound. It has also been adopted by at least one other state appellate court. *See Borgen v. State*, 58 Md.App. 61, 472 A.2d 114, 123 (viewing issue of voluntary consent "we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested) [but] make our own independent judgment as to what to make of those facts; we must, in making that independent judgment resolve for ourselves the ultimate second-level fact—the existence or non-existence of voluntariness."), *cert. denied*, 300 Md. 483, 479 A.2d 372 (1984). This two step analysis is consistent with our prior directives to trial courts to make detailed basic factual findings rather than conclusory statements. *See State v. Lovegren*, 798 P.2d 767, 770 (Utah Ct.App.1990) (detailed findings necessary to facilitate meaningful appellate review);

*State v. Sierra*, 754 P.2d 972 (Utah Ct.App.1988). It seems to defeat the purpose of appellate review if a trial court is permitted to make only one ultimate factual "finding"—"the defendant voluntarily consented to the search." Yet, we do acknowledge that the issue of voluntary consent is extremely fact sensitive and trial judges may arguably be in the best position to determine voluntary consent after hearing all the evidence. A trial judge may not be able to articulate exactly what prompted the determination that one consent was voluntary while another was coerced, but the judge knows or senses the difference after hearing first-hand the testimony offered and perceiving the nuances and subtleties of that testimony. There may be sound policy reasons to ignore the more analytically precise approach advocated by *Bobo* and to simply defer to the trial court even though technically a determination of voluntary consent is more akin to a legal conclusion.

In sum, we believe that the standard of review to be applied when reviewing a trial court's determination of voluntary consent, reasonable suspicion, or when a seizure occurs should be definitively determined by the Utah Supreme Court in order to put to rest the conflicts between panels of this court and alleviate the confusing state of the law on these continually recurring issues.

the record establish that the consensual search which resulted in the ultimate discovery of the drugs occurred immediately after an illegal seizure. Defendant had been previously seized without reasonable suspicion[9] at the time he was requested to permit the pat-down search. Subsequently, he consented to and raised his shirt displaying the tape around his middle. There were no *Miranda* warnings, or other intervening circumstances documented in the record between the time of his illegal seizure, and the ultimate consensual search when he lifted his shirt revealing the tape which led to the discovery of the contraband. On the uncontroverted facts in the record before us, we conclude that defendant's consent first to the pat-down search and then to lifting his arms to allow the officer to see the taped packages he had previously felt during the pat-down search was tainted by his prior illegal seizure as a matter of law and, therefore, that the contraband should have been suppressed.

In sum, we conclude that although defendant's initial encounter with the narcotics officers was a level one, voluntary or consensual encounter, it escalated to a level two seizure *at least* at the point Fullmer asked to search defendant by conducting a pat-down search while Palmer was simultaneously searching defendant's belongings. We further uphold the determination of the trial judge that the officers did not have reasonable suspicion to suspect defendant was transporting illicit drugs at the time he was seized. Such a level two stop in the absence of reasonable suspicion amounts to a violation of defendant's fourth amendment right to be free from unreasonable search and seizure. This constitutional violation is not necessarily cured by defendant's voluntary consent to the subsequent searches which exposed the contraband. We find the subsequent searches which exposed the contraband, although pursuant to voluntary consent, on the facts in the record, were not sufficiently attenuated to

be purged of the effect of the prior illegal seizure.

GARFF and ORME, JJ., concur.

---

9. The trial judge concluded there was reasonable suspicion to support defendant's detention only after he lifted his shirt, displaying the tape, *and* his explanation for the tape was illogical. However, defendant had previously been seized without supporting reasonable suspicion immediately prior to the pat-down search, which preceded the lifting of his shirt.