STATE of Utah, Plaintiff and Appellee,

v.

Phillip D. STRICKLING, Defendant and Appellant.

No. 910621–CA.

Court of Appeals of Utah.

Dec. 3, 1992.

Rehearing Denied Jan. 15, 1993.

Robert L. Steele, Joan C. Watt, Paul M. Grant, and Ronald S. Fujino (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for appellant.

R. Paul Van Dam, State Atty. Gen. and J. Kevin Murphy, Asst. Atty. Gen. (argued), Salt Lake City, for appellee.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Defendant appeals the district court's denial of his motion to suppress evidence based on the arguments that the police officer had no articulable suspicion to stop defendant's car and that the ensuing inventory search of his vehicle was illegal. We affirm.

## STANDARD OF REVIEW

■ This court defers to the trial court's factual findings and accordingly will disturb those findings only if they are clearly erroneous. *See State v. Bobo,* 803 P.2d 1268, 1272 (Utah App.1990); *State v. Elder,* 815 P.2d 1341, 1343 (Utah App. 1991). *See also United States v. Kordosky,* 878 F.2d 991, 993 (7th Cir.1989) (district court's finding that an inventory search was conducted in accordance with standard procedures reviewed under clearly erroneous standard). Findings are clearly erroneous only if they "are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker,* 743 P.2d 191, 193 (Utah 1987). In reviewing the legal conclusions based on the underlying facts, we apply the correction of error standard. *See State v. Vigil,* 815 P.2d 1296, 1299–1300 (Utah App.1991). Thus, the factual findings supporting the trial court's decision that the stop and search were conducted in a constitutionally permissible manner are reviewed under the "clearly erroneous" standard, while the ultimate legal determination that the stop and search comported with the Fourth Amendment is reviewed for correctness. *See Vigil,* 815 P.2d at 1298–1300 (voluntariness of consent for search is mixed question of law and fact with predicate facts weighed against clearly erroneous standard and the resulting legal conclusions reviewed for correctness).

In the present case, the defendant challenges several of the district court's factual

findings. The court believed the arresting officer to be a credible witness and therefore based its findings almost exclusively on his testimony. None of these findings appear to be against the clear weight of evidence. Accordingly, the following statement of facts is taken largely from the district court's findings of fact.

## FACTS

While on motorcycle patrol at approximately 1:45 a.m. on May 3, 1991, Officer Buckmiller, a University of Utah police officer, saw a red Monte Carlo stopped in an alley parking area next to the Sigma Nu fraternity house at the University of Utah. The car's doors were open and its lights were out. Two people exited the Monte Carlo, approached a nearby car, and pressed their faces against the windows with their hands cupped around their faces. As the officer approached, these two ran away on foot.

Earlier in the evening, Officer Buckmiller had encountered the two young men about a block and a half from the fraternity house and asked them if they had been "car hopping." Although the officer had mentioned nothing about burglary, they answered that they had nothing to do with "breaking into cars." Based on his familiarity with the fraternity, the addresses given by the two young men at the time of the earlier encounter, and their apparent ages, Officer Buckmiller did not believe the two to be members of the fraternity. He knew that the university area had experienced a number of car burglaries and, in fact, he had overheard conversations concerning two car burglaries that night over his police radio.

At the same time the two young men fled, the Monte Carlo departed, throwing gravel as it left the scene. As he followed the car, Officer Buckmiller noticed the license plate registration sticker had expired and, activating his flashing lights, stopped the car. As he approached the car, the passenger, who the officer had twice before arrested, stepped out. The officer ordered the passenger back into the car and called for backup. The driver of the car was the defendant, Phillip Strickling. While he was waiting for assistance, Officer Buckmiller approached a nearby tree for cover. At this time, he noticed the occupants reach under the seat, but he could not determine whether they were placing something under, or removing something from under, the seat. He ordered the occupants to place their hands on the dashboard. Police backup arrived a few minutes later. The occupants were then ordered to stand behind the car with another police officer. Officer Buckmiller looked under the seat where the two had reached and removed a stereo component with frayed wires attached. Officer Buckmiller impounded the car for a registration violation and conducted an inventory search. At that time, he discovered more stereo equipment. After the police verified that the stereo equipment was stolen, they arrested the defendant and passenger.

The defendant entered a conditional plea of guilty to theft by receiving, a class A misdemeanor, explicitly reserving his right to appeal the trial court's denial of the motion to suppress the evidence seized during the search. *See State v. Sery*, 758 P.2d 935, 939 (Utah App.1988) (conditional pleas reserving suppression issue are permissible in Utah).

While several issues are briefed, two assume pivotal significance. First, was the officer's initial stop of defendant based on articulable, reasonable suspicion? Second, did the scope of the search exceed the permissible constitutional limits?

## LEGALITY OF THE STOP

Automobile stops fall within the ambit of the Fourth Amendment to the United States Constitution "because stopping an automobile and detaining its occupants constitutes a 'seizure.'" *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). The stop in this case can be constitutionally justified in either of two ways:

First, it could be based on specific, articulable facts which, together with rational inferences drawn from those facts, would lead a reasonable person to con-

clude [the detainee] had committed or was about to commit a crime. Second, the stop could be incident to a lawful citation for [a] traffic violation. . . .

*State v. Sierra,* 754 P.2d 972, 975 (Utah App.1988) (citations omitted). The facts of the present case justify a warrantless stop.

■ The defendant spends much effort dissecting the facts that confronted Officer Buckmiller the night of the arrest and argues that these facts fail to support articulable suspicion of criminal activity. Looking at each fact in isolation, as defendant does, is not proper. We instead rely upon a test that "consider[s] the totality of the circumstances to determine whether the officer had 'specific and articulable facts'" to support suspicion. *State v. Munsen,* 821 P.2d 13, 15 (Utah App.1991) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)), *cert. denied,* 843 P.2d 516 (Utah 1992). *See also Terry,* 392 U.S. at 22, 88 S.Ct. at 1880–81 (defendant's actions, each of which was innocent, when taken together warranted further investigation). Here, the State argues the following facts, taken together, supported the officer's suspicion: (1) the early morning hour, (2) car burglaries had occurred that night in the immediate area, (3) a car was parked in an alley parking area next to a fraternity house with its lights off and door open, (4) near that car were two young men, who the officer reasonably believed did not belong to the fraternity, peering into a parked car window with cupped hands, (5) these same young men fled upon the approach of police, and (6) the car sped off when the officer approached.

"[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In light of all the facts confronting Officer Buckmiller when he first encountered the defen-

dant, "[i]t would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further." *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881. *Cf. State v. Ballenberger,* 652 P.2d 927, 929 (Utah 1982) (lateness of hour, officer's knowledge of high rate of burglary in the area, along with other factors, justified further investigation); *State v. Ramirez,* 814 P.2d 1131, 1134 n. 1 (Utah App.1991) (flight, coupled with other facts of the case, is among factors considered to determine probable cause for arrest). Thus, under all the circumstances, Officer Buckmiller was justified in stopping the defendant based on articulable suspicion that a crime was about to be committed.[1]

## LEGALITY OF THE SEARCH

### A. Weapons Search

■ Because the initial stop was justified, we must now ascertain whether the officer's search was "reasonably related in scope to the circumstances which justified it in the first place." *State v. Robinson,* 797 P.2d 431, 435 (Utah App.1990). As discussed above, Officer Buckmiller's reasonable suspicion of criminal activities, namely auto burglary, justified the initial stop. The State argues the officers were justified in searching under the front seat of the defendant's car in order to search for weapons. It bases its assertion on the fact that after he stopped the defendant's car, Officer Buckmiller observed the occupants reach under the seat and that he was therefore legitimately concerned for his safety.

In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the United States Supreme Court ruled that if a police officer has specific articulable facts which reasonably warrant the officer to believe that the suspect is dangerous and may gain *immediate control* of weapons, the officer can search the suspect and

---

1. Officer Buckmiller testified that he stopped the vehicle both because of his suspicion about criminal activity in process and because the vehicle's registration had expired. In that we have concluded his reasonable suspicion was an adequate basis for the stop, we have no need to address whether the registration violation also permitted the stop or defendant's related argument that insofar as the stop was based on the expired registration it was impermissibly pretextual under *State v. Lopez,* 831 P.2d 1040, 1044 (Utah App.1992).

those nearby areas where a weapon may be hidden. *Id.* at 1049–50, 103 S.Ct. at 3481. The Court further held that items are within the immediate control of a person detained by police when located in "the relatively narrow compass of the passenger compartment" of an automobile because such items "are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon.'" *Id.* at 1050, 103 S.Ct. at 3480 (quoting *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)).

The trial court found in the present case that Officer Buckmiller took several reasonable precautions for his own safety and that he feared the occupants of the Monte Carlo might be reaching for a weapon. The officer stated he feared for his safety even before he observed the occupants reach under the seat. During this time, he was moving toward a tree for cover and trying to reach his dispatcher for backup. These actions appear prudent in light of the fact that Officer Buckmiller observed the passengers engaged in activities that likely were precursors to a burglary.

The Utah Supreme Court has held that a police officer may legally frisk a burglary suspect because "[i]t is reasonable for an officer to believe that a burglar may be armed with weapons." *State v. Carter,* 707 P.2d 656, 660 (Utah 1985). Defendant in this case argues the *Carter* court based its holding on the fact that the defendant in that case had a large bulge in his pocket. Although this was one factor the officer in *Carter* relied on to justify the frisk, the Supreme Court further relied on the common sense awareness that "[i]t is not unlikely that a person engaged in stealing another person's property would arm himself against the possibility that another person will appear unexpectedly and object strenuously." *Id.* (quoting *People v. McGowan,* 69 Ill.2d 73, 12 Ill.Dec. 733, 736, 370 N.E.2d 537, 540 (1977), *cert. denied,* 435 U.S. 975, 98 S.Ct. 1624, 56 L.Ed.2d 69 (1978)). *See also United States v. Walker,* 924 F.2d 1, 4 (1st Cir.1991) (officer's experience that burglars often carry weapons and elusive conduct of defendant supported concern for safety; frisk was reasonably

related to scope of circumstances justifying original stop).

In the instant case, Officer Buckmiller did not have to be absolutely certain the defendant was manipulating weapons in the car. Instead, we consider only "whether a reasonably prudent man in [these] circumstances would be warranted in the belief that his safety ... was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. Because the officer in this case suspected the occupants were involved in a burglary and also saw them reach under the seat, he was justified, under all the circumstances, in believing he was in potential danger.

Defendant further argues that even if the officer's belief was justified, the search was illegal because the occupants did not have immediate access to the car at the time of the search. While Officer Buckmiller conducted the search, the driver and passenger were standing at the back of the car with Officer Johnson. We are not persuaded by defendant's argument because weapons hidden in the passenger compartment of a car might still be a danger even when the occupants have been temporarily detained outside the car. *See United States v. Maestas,* 941 F.2d 273, 277 n. 4 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 909, 116 L.Ed.2d 809 (1992).

In *Long,* police officers confronted the defendant outside his car after they observed him drive erratically and swerve into a ditch. As the defendant walked back to his car, the police noticed a knife on the floor of the car. With the defendant at the rear of the car with one officer, the other officer looked into the car with a flashlight and thereafter found marijuana and other drug contraband. *See Long,* 463 U.S. at 1032, 103 S.Ct. at 3471. In finding the search constitutionally permissible, the Court placed great significance on the fact that a suspect in the defendant's position might "break away from police control and retrieve a weapon from his automobile." 463 U.S. at 1052, 103 S.Ct. at 3482.

Federal courts, as well as other state courts, have had ample occasion to review similar cases and have rather consistently determined police to be justified in making weapons searches which extend to the inte-

rior of automobiles even when detainees are outside the vehicle being searched. *See, e.g., Maestas,* 941 F.2d at 277 (police were justified in conducting *Terry* search of passenger compartment while defendant was standing at rear of truck in company of another officer); *United States v. Lego,* 855 F.2d 542, 545–46 (8th Cir.1988) (reasonable for officers to search truck while detainee was confined to police car before allowing him to return to car); *United States v. Ray Tan,* 701 F.Supp. 45, 48 (E.D.N.Y.1988) (because driver reached under seat, search of passenger compartment was justified even when detainee was guarded outside the car by several agents); *People v. Melgosa,* 753 P.2d 221, 225–26 (Colo.1988) (search was justified after occupants were placed in police car because passenger had reached under seat during the stop). Encounters between police and detainees during a road stop can be especially volatile. *Long,* 463 U.S. at 1048, 103 S.Ct. at 3480. It would be imprudent to restrict law enforcement officers' ability to defuse such encounters simply because they have temporarily stabilized a situation. Accordingly, we conclude that the scope of the weapons search in the present case was justified, and the trial court properly refused to suppress the stereo component discovered in the course of that search.

## B. Inventory Search

 The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." According to well established judicial doctrine, the right to be free from unreasonable governmental intrusion exists "whenever an individual may harbor a reasonable 'expectation of privacy.'" *Terry,* 392 U.S. at 9, 88 S.Ct. at 1873 (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). The Fourth Amendment further requires that a search be conducted pursuant to a warrant based on probable cause. There are, however, several narrow exceptions to the warrant requirement including, but not limited to, a search incident to an arrest, a search of an automobile based on probable cause that it contains contraband, and seizure of evidence in the plain view of one who is lawfully in the place from where the evidence is seen. *State v. Hygh,* 711 P.2d 264, 267 (Utah 1985). The State bears the burden of showing that the circumstances of the seizure constitute an exception to the warrant requirement. *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969); *State v. Christensen,* 676 P.2d 408, 411 (Utah 1984).

While the Fourth Amendment applies to automobiles, courts traditionally uphold warrantless searches of automobiles where similar searches in a home would be considered unconstitutional.[2] *See South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Courts base their differential approach to cars upon several factors: the automobile's mo-

**2.** The Utah Supreme Court appears to have recognized a greater degree of protection to automobiles under article I, section 14, of the Utah Constitution than that provided by the Fourth Amendment to the United States Constitution. *See State v. Larocco,* 794 P.2d 460, 465–71 (Utah 1990). The precedential value of the *Larocco* rationale is somewhat unclear, however, because Justice Durham's reasoning was joined by only Justice Zimmerman. Justice Stewart concurred in the result, but provided no insight into his rationale. Because he concurred only in the result, and because Justice Durham arrived at the result by using state constitutional analysis, it is possible that Justice Stewart arrived at his conclusion strictly through a Fourth Amendment approach. *Cf. Sims v. Utah State Tax Comm'n,* 841 P.2d 6, 15 (Utah 1992) (Stewart, J., concurring in the result) (in roadblock case, Justice Stewart condemns lead opinion's reliance on state constitutional analysis because "the roadblock [was] illegal under federal law"); *State v. Larocco,* 742 P.2d 89, 101–02 (Utah App.1987) (Billings, J., concurring in part and dissenting in part) (arguing, inter alia, that *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), alone, would justify a holding that the search in question was unconstitutional).

Defendant relies largely upon *Larocco* for his state constitutional argument. He asserts that inventory searches are illegal because under *Larocco,* an officer must have a warrant or probable cause to search a vehicle for any purpose. Furthermore, he argues that inventory searches involve neither probable cause nor exigent circumstances and therefore are not excep-

bility and the likelihood of exigency, the lower expectation of privacy concerning one's car, the pervasive government regulation of automobiles and resulting likelihood of encounters with police, and the public nature of automobile travel. *Id.*

▉ Inventory searches of impounded vehicles' contents constitute an exception to the warrant requirement because such a search is not conducted to investigate criminal activity and no variant of individualized suspicion is necessary to permit one. Instead, police conduct such inventory searches to protect property in the car, to protect police against the claim of theft, and to protect police from potential danger. *Opperman*, 428 U.S. at 369, 96 S.Ct. at 3097; *State v. Romero*, 624 P.2d 699, 701 (Utah 1981). These caretaking functions, when balanced against the citizen's interest in the privacy of automobile contents, justify inventory searches of impounded vehicles when performed in accordance with standardized procedures. *See Opperman*, 428 U.S. at 378–381, 96 S.Ct. at 3101–03 (Powell, J., concurring).

### 1. Justification for Impoundment

▉ In the instant case, this court must first determine whether Officer Buckmiller

possessed "reasonable and proper justification" to impound the defendant's vehicle "either through explicit statutory authorization or by the circumstances surrounding the initial stop." *Hygh*, 711 P.2d at 268. Here, Officer Buckmiller impounded the car pursuant to Utah Code Ann. § 41–1–115 (Supp.1991),[3] which provided, in pertinent part, as follows:

(1) The department or any peace officer, without a warrant, may seize and take possession of any vehicle:

(a) which is being operated with improper registration....

Because the Motor Vehicle Act authorized Officer Buckmiller to impound the defendant's vehicle, the alternative prong under *Hygh*, whether "the circumstances surrounding the initial stop," 711 P.2d at 268, warranted impoundment, need not be explored.[4] The State has, therefore, met its burden of showing that a reasonable and proper justification existed for the impoundment of defendant's vehicle.[5]

### 2. Claim of Pretext

▉ Defendant nonetheless argues that impoundment for the registration violation

---

tions to the warrant requirement. The defendant ignores a post-*Larocco* decision by this court, which upheld the constitutional validity of an inventory search. *See State v. Sterger*, 808 P.2d 122 (Utah App.1991). A fundamental departure from the well established law regarding inventory searches, which in this case would be based on the Utah Constitution, must come, if at all, from the Utah Supreme Court.

**3.** Incident to legislative revision, Utah Code Ann. § 41–1–115 now appears as Utah Code Ann. § 41–1a–1101 (Supp.1992).

**4.** Defendant argues that *Hygh* controls this case and that this court should rule the inventory search here was a pretext to conduct a criminal investigation. In *Hygh*, a police officer stopped the defendant because he noticed that the car's safety sticker had expired and also observed that the defendant fit the description of a robbery suspect. After conducting a warrants check, the officer arrested the defendant for outstanding misdemeanor warrants. He then impounded the defendant's car and conducted an inventory search. The officer discovered a weapon and clothes that had apparently been used in a recent robbery. *Hygh*, 711 P.2d at

266–67. The Utah Supreme Court held that the "'inventory' search was merely a pretext for a warrantless search." *Id.* at 270.

Defendant in this case places great emphasis on the fact that the *Hygh* court looked at the circumstances surrounding the search and stated that if the true purpose of the search was to effectuate the caretaking purposes of an inventory search, "an indicia that such is the real purpose of the search is to consult with the owner [concerning the disposition] of the vehicle when he is present at the time of impound." *Id.* at 269. Defendant, however, misconstrues the context of the *Hygh* court's remarks. The Court only looked at the circumstances surrounding the search to determine whether reasonable and proper justification existed for the impoundment because no statutory authority existed to provide the justification in that case. *Id.* at 268.

**5.** In *Hygh*, the Utah Supreme Court specifically mentioned the section of the Motor Vehicle Act that the police relied on in the present case as an example of statutory authority that provides reasonable and proper justification for impoundment. *See Hygh*, 711 P.2d at 268 (citing Utah Code Ann. § 41–1–115).

was impermissible under the pretext doctrine recently recognized by this court. *See, e.g., State v. Figueroa–Solorio*, 830 P.2d 276, 281–82 (Utah App.1992) (Orme J., concurring); *State v. Marshall*, 791 P.2d 880, 882–83 (Utah App.), *cert. denied*, 800 P.2d 1105 (Utah 1990); *State v. Sierra*, 754 P.2d 972, 977–80 (Utah App.1988). Although the pretext doctrine has heretofore been applied by this court only in evaluating the legality of an initial stop, we will assume, although we do not decide, that an equivalent ,doctrine applies in evaluating whether, having made a lawful stop, the further decision to impound the vehicle was proper. Even though the watershed pretext case, *State v. Lopez*, 831 P.2d 1040 (Utah App.1992), addressed whether an initial stop for a minor traffic violation was an impermissible pretext for investigation of more serious criminal activity, *see id.* at 1046–50, the basic analysis applies equally well in the context of an apparently lawful inventory search allegedly used as an impermissible pretext for criminal investigation.

In *Lopez*, we ruled that an "officer's subjective motivation is *not* the relevant inquiry" in determining whether a stop for a traffic violation is a pretext for an unconstitutional purpose. *Id.* at 1047 (emphasis in original). Instead, our inquiry "must turn on the objective question of whether a reasonable officer *would* have made the stop under the same circumstances absent the illegal motivation." *Id.* (emphasis in original). Moreover, in order to carry its initial burden of proving that a reasonable officer would have stopped the defendant's vehicle, the State needs only introduce the involved officer's testimony of his "justifications for the actual stop and the officer's normal practices." *Id.* at 1049.

Focusing now on the decision to impound rather than the decision to stop, the State produced the necessary threshold evidence when Officer Buckmiller testified that he encountered vehicles with expired license plate registrations on a daily basis and that he impounds sixty to seventy-five percent of the vehicles he stops for such violations.[6] His subjective motivation in wanting to search defendant's vehicle for evidence of burglary is essentially irrelevant. The determinative evidence here is what the officer actually did, without regard to his motives in a particular case, when confronted with registration violations. Officer Buckmiller's unrefuted testimony is that he impounded the great majority of vehicles he stopped with expired registrations. Defendant made no showing that Officer Buckmiller's practice in this regard was at odds with what reasonable officers customarily do. *See Lopez*, 831 P.2d at 1049–50 (after State meets initial burden of showing what reasonable officer would do through testimony of particular officer concerning his normal practice, burden shifts to defendant). The impoundment was not, therefore, an unconstitutional pretext, even if pretext analysis is appropriately applied to vehicle impoundment.

### 3. Compliance with Standardized Procedures

When impoundment of a vehicle is justified, the ensuing search must be "conducted for inventory purposes, in a legal manner, and not merely as a 'fishing expedition for evidence.'" *Sterger*, 808 P.2d at 125. Just as search warrants based on probable cause ensure that police do not act arbitrarily in selecting persons and places to search, a regularized set of procedures guards against arbitrariness when

---

**6.** Officer Buckmiller's testimony concerning the percentage of cars with expired tags that he impounds is somewhat confusing. Nonetheless, during cross-examination, he agreed that up to forty percent of the cars he encountered with expired tags were not impounded. Even with this admission, a majority of encounters appeared to result in impoundment. Mere statistics are not necessarily dispositive in these fact-intensive cases and objective determinations must be made on the basis of the factual milieu of each case. In the instant case, the lateness of the hour is a rational basis for impounding the car even if the officer does not impound every car he discovers with an expired registration. Not only does the officer have more time available to deal with this comparatively minor offense than at busier times of the day, but the need to secure the vehicle, especially in an area plagued by auto burglary, is much more compelling.

police conduct warrantless inventory searches. *See* 3 Wayne R. LaFave, *Search and Seizure* § 7.4(a) at 109 (2d ed. 1987); *State v. Shamblin*, 763 P.2d 425, 428 (Utah App.1988). When police conduct an inventory search within the parameters of "standard police department procedures, there is no significant danger of hindsight justification." *Opperman*, 428 U.S. at 383, 96 S.Ct. at 3104 (Powell, J., concurring). Furthermore, courts view inventories carried out in accordance with standard procedures as "a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 375, 96 S.Ct. at 3100. "Inventories should not be upheld under *Opperman* unless the government shows that there exists an established reasonable procedure for safeguarding impounded vehicles and their contents and that the challenged police activity was essentially in conformance with that procedure." *Hygh*, 711 P.2d at 269 (quoting 2 LaFave, *Search and Seizure* § 7.4, at 576–77 (1978)).

▮▮▮▮ The pivotal determination with respect to the inventory search issue is whether the evidence presented by the State at the suppression hearing was sufficient to support a finding that Officer Buckmiller acted in compliance with established departmental procedures for conducting an inventory search. Evidence regarding the procedures for inventory searches in this case came solely from the testimony of Officer Buckmiller at the suppression hearing. On direct examination by the prosecutor, the officer testified as follows:

Q: And what is your procedure on impounds—inventory—

A: What our policy states, that the vehicle will be searched completely. The search will include but not be limited to the trunk, locked portions of the vehicle, locked cases, et cetera.

Q: Did you follow your procedures for impounding?

A: Yes, sir.

Q: Did you deviate from them in any way?

A: No, sir.

Q: After you discovered the stereo, did you deviate or stop the procedure?

A: It was not stopped. I continued the procedure while Officer Johnston had dispatch make some telephone calls.[7]

Numerous decisions require that the government demonstrate the existence of standardized procedures to regulate particular aspects of police conduct during inventory searches in order for such searches to satisfy the Fourth Amendment. *See, e.g., Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (where no policy existed regarding treatment of closed containers during inventory search police could not open locked suitcase); *State v. Johnson*, 745 P.2d 452, 455 (Utah 1987) (police were justified in looking under hood when such a search was conducted according to police department procedures for all vehicles); *Shamblin*, 763 P.2d at 427–28 ("Fourth Amendment *is* violated if closed containers are opened during a vehicle inventory search in the absence of a standardized, specific procedure mandating their opening") (emphasis in original). *Cf. Colorado v. Bertine*, 479 U.S. 367, 375–76, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987) (police could impound vehicle where standardized procedures allowed discretion between impounding or parking and locking

---

**7.** On cross-examination, Officer Buckmiller responded to defense counsel's questions on several occasions by referring to the fact that various actions were or were not taken because of department policy. For example, when defense counsel began a line of inquiry to determine why Officer Buckmiller did not let the defendant make alternate plans for property in the car, the following exchange occurred:

A: Well, you had no intention of allowing him to dispose of any property in that car, other than through an inventory, right?

A: As I indicated, I don't do that normally, so why would I in this circumstance? No, I would not.

. . . .

Q: But, even though there might be an easier way to deal with the property and an individual's property rights with the car—

A: As I indicated, that's not a normal practice.

Q: But, sometimes it is, right?

A: No, sir, it is not, not with me, not with our department.

vehicle). Here the defendant fails to point to any particular activity where the police did not act according to standard procedures, but only asserts there was insufficient evidence showing that such procedures existed.[8] Thus, we are left to determine only whether the trial court clearly erred in finding that Officer Buckmiller conducted the search according to his department's procedures.[9]

■ Defendant does not argue, nor does precedent require, that the government must submit written procedures in order to carry its burden of showing that its agents acted in accordance with standardized procedures when performing an inventory search of an impounded automobile.[10] In *United States v. Kordosky*, 921 F.2d 722 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 94, 116 L.Ed.2d 66 (1992), the Court of Appeals, at the near-conclusion of a rather convoluted case history,[11] confronted an evidentiary showing to support the existence of standardized policies much like the record reflects in this case.

In *Kordosky*, police stopped and arrested defendant, who had been under investigation for drug-related activities, for driving without a license. *United States v. Kordosky*, 878 F.2d 991, 992 (7th Cir.1989). During the arrest, the police noticed drug paraphernalia and then searched the car. After discovering more drug-related material, the defendant was arrested and the police seized the car for future civil forfeiture. The police discovered cocaine in a locked compartment during an ensuing inventory search. Among other issues, defendant claimed that the inventory search had not been conducted in accordance with standard departmental procedures. *Id.* at 993.

During the hearing on a motion to suppress, the police officer who conducted the search testified about his extensive experience with the police department and then

---

8. Defendant contends there was no way for the court to determine whether the inventory was conducted properly given the dearth of testimony concerning the department's standard procedure and further asserts that the original inventory sheet was never offered into evidence. However, the record reflects no argument at the hearing by defendant that the search was conducted incorrectly, nor was there any objection by the defendant to the prosecution's failure to offer the original inventory sheet or any argument particularly addressed to such failure.

9. Our decision today does not prejudge a case in which defendant makes an assertion that police department policies fail to prescribe the scope of an inventory search in some specific aspect. Previous cases indicate a stronger evidentiary showing is required when the policies concerning closed containers or the areas of the car to be searched are challenged. *See Johnson,* 745 P.2d at 455 (inspecting under the hood and in the trunk comports with Fourth Amendment when conducted according to inventory checklist); *Shamblin,* 763 P.2d at 427–28 (absence of a standardized, specific procedure requiring the opening of all closed containers mandated suppression of contraband found in closed container during inventory search).

10. Courts ruling that inventory searches were illegal because the scope of searches was unlimited have typically based their rulings on the fact that *no* evidence existed to show police acted in accordance with standardized guidelines. *See, e.g., Florida v. Wells,* 495 U.S. 1, 4,

110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) ("Florida Highway Patrol had no policy whatever with respect to the opening of closed containers"); *United States v. Salmon,* 944 F.2d 1106, 1121 (3rd Cir.1991) ("Because the record contains no evidence of a policy regarding the scope of an inventory search, we cannot uphold [the searches]"), *cert. denied, Washington v. United States,* —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992).

11. The Court of Appeals first considered the case in *United States v. Kordosky,* 878 F.2d 991 (7th Cir.1989). In a memorandum decision, the United States Supreme Court vacated and remanded the original Court of Appeals decision for reconsideration in light of *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). *See Kordosky v. United States,* 495 U.S. 916, 110 S.Ct. 1943, 109 L.Ed.2d 306 (1990). On remand, the Court of Appeals directed the district court to determine whether "your" standard procedure meant the department's standardized procedures as opposed to an individual officer's practice and whether the policy directed police to open all closed containers. *United States v. Kordosky,* 909 F.2d 219 (7th Cir.1990). The case came before the Court of Appeals a third, and final, time in *United States v. Kordosky,* 921 F.2d 722 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 94, 116 L.Ed.2d 66 (1992). In its final disposition of the case, the Seventh Circuit held the testimony of two police officers was sufficient to demonstrate that the inventory search was conducted according to standardized procedures. *Kordosky,* 921 F.2d at 724.

testified as to the standard practice regarding the seizure of automobiles. *Id.* Defendant argued that such testimony only established that particular officer's standard procedure. Upon remand to the district court, both the officer who conducted the inventory and the officer in charge of the drug investigation provided almost identical testimony concerning the department's inventory search policies. Their testimony revealed that "[n]either of the detectives professed any great familiarity with the Manual [of Policy], which, according to both, is 'continually changing.'" *Kordosky,* 921 F.2d at 723. The officers further testified that their specific Inter–County Narcotics and Vice Unit had "no written list of procedures and/or policies," but that new officers assigned to the unit were trained as to "the procedures that have been followed throughout the years by the unit." *Id.* The officers appear to have testified only that all seized cars should be inventoried and that all locked and unlocked containers must be opened. *See id.* The Court of Appeals reasoned that "nothing in *Wells, Bertine,* or the remainder of the cases in this area require[s] the policy to be reduced to writing." *Id.* at 724. The court then accepted the district court's finding that "the Unit had an official, unwritten, standard policy" that comported with the Fourth Amendment requirements for an inventory search. *Id.* Cf. *Rabadi v. State,* 541 N.E.2d 271, 275–76 (Ind.1989) (testimony of a detective from a police department's violent crime division, who upon request from a different police department conducted a search three days after impoundment, was insufficient evidence to prove a search was a routine inventory); *State v. White,* 387 A.2d 230, 233 (Me.1978) (testimony of two police officers provided sufficient evidence that it was standard practice for police to inventory the contents of impounded vehicles).

As noted above, Officer Buckmiller testified that he had significant experience with impoundments; that departmental policy required an inventory search of all impounded vehicles; that such searches were to extend to all areas of the vehicle, including the opening of locked containers; and that he followed these procedures. Furthermore, he responded to several questions on cross-examination by referring to normal departmental practice. His testimony demonstrated more certain knowledge of police procedures than that offered by the officers in *Kordosky.* Although the evidence of departmental procedures in the present case is admittedly thin, it is no less probative of standardized policies than that adduced in *Kordosky.*[12] We therefore conclude the district court's findings that there were standardized procedures, and that the inventory was conducted according to those standardized procedures, were not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the trial court's decision denying defendant's motion to suppress is affirmed.

GARFF, Judge (concurring):

I concur in the main opinion.

I comment to make clear my position on the standard of review for reasonable suspicion. In *State v. Carter,* 812 P.2d 460 (Utah App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992), I concurred with Judge Orme in the opinion written by Judge Billings on this same standard of review. We said

> we are puzzled by what standard of review we should apply in reviewing a trial court's determination of reasonable suspicion. The Utah Supreme Court has previously treated a determination of reasonable suspicion as a factual finding, indicating that determinations of reasonable suspicion are properly reviewed by appellate courts under a clearly errone-

---

12. We note the possibility that the State could not carry its burden if it could not produce a written policy in the face of a "best evidence" objection to an officer's testimony concerning written policies, or if it could not produce superiors in the police department in the face of a hearsay objection to an officer's testimony concerning unwritten policies. No such objections were interposed here nor did defendant undertake affirmatively to show that the police department's inventory procedures were not as Officer Buckmiller claimed they were.

ous standard. *See State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987) ("In determining whether the facts support a reasonable suspicion ..., a trial court must consider the totality of the circumstances facing the officers. The reviewing court should not overturn the trial court's determination unless it is clearly erroneous.") ...

Analytically, however, we are inclined to agree with the trial court that a determination of reasonable suspicion more logically falls into the conclusion of law category.... *See also Hayes v. State,* 785 P.2d 33, 36 (Alaska Ct.App.1990) (reasonable suspicion is mixed question, factual findings upheld unless clearly erroneous, but ultimate conclusion is subject to de novo review).

*Id.* at 466, n. 6.

In *State v. Munsen,* 821 P.2d 13 (Utah App.1991), I authored an opinion, with Judge Russon concurring and Judge Jackson concurring in result only,[1] where we said:

Munsen does not challenge the court's findings. Rather she challenges the court's application of the law to the findings. We "review the ultimate conclusions drawn from those findings as a matter of law, under a correction of error standard, affording no deference to the trial court." *State v. Taylor,* 818 P.2d 561, 565 (Utah App.1991). *See State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987); *State v. Carter,* 812 P.2d 460, 466 n. 6 (Utah App.1991). *See also United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1416 (9th Cir.1989) (setting forth the generally held view that whether reasonable suspicion exists is a mixed question of fact and law, and the trial court's ultimate conclusion regarding reasonable suspicion is a legal conclusion which is reviewed de novo).

*Id.* at 14–15.

I am still of the opinion that in a mixed question of law and fact, the final conclusion as to whether there is reasonable sus-

picion is a conclusion of law, and therefore the standard of review should be correction of error.

JACKSON, Judge (concurring):

I concur with the result reached by my colleagues but disagree with the standard of review for reasonable suspicion which they have selected. Although Judge Orme, writing for the panel in *State v. Vigil,* 815 P.2d 1296, 1299–1300 (Utah App.1991), expressed concern for consistent application of the law as manifested in the doctrine of stare decisis, his opinion here ignores the important concept of stare decisis. Judge Garff's concurring opinion does likewise. Rather, both prefer to rely upon court of appeals opinions such as *State v. Vigil,* 815 P.2d 1296 (Utah App.1991); *State v. Carter,* 812 P.2d 460 (Utah App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992), and ignore the rule of law declared by the Utah Supreme Court. The Utah Supreme Court has consistently applied the clearly erroneous standard of review to the issue of reasonable suspicion. *State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987) (the reviewing court should not overturn the trial court's determination of reasonable suspicion unless it is clearly erroneous). To date, no supreme court holding subsequent to *Mendoza* has modified, disavowed, or overruled this standard.

Today's decision should be controlled by the important doctrine of *stare decisis,* the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact.

*Vasquez v. Hillery,* 474 U.S. 254, 265–66, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) (quoting *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412, 52 S.Ct. 443, 449, 76

---

1. In his concurring opinion, Judge Jackson agreed with the trial court that the officer had reasonable suspicion to justify detention, but thought the length and scope of the detention was not justified by the circumstances.

L.Ed. 815 (1932) (Brandeis, J., dissenting)). Pursuant to this doctrine, reasonable suspicion is to be reviewed under the clearly erroneous standard of review. The principle of stare decisis requires that we "continue the journey until our supreme court chooses to change course." *Cannefax v. Clement,* 786 P.2d 1377, 1383 (Utah App. 1990) (Jackson, J., concurring), *aff'd,* 818 P.2d 546 (Utah 1991).