2002 UT App 190

**STATE of Utah, Appellee,**

v.

**Angie BRAKE, Appellant.**

No. 20010204–CA.

Court of Appeals of Utah.

May 31, 2002.

Margaret P. Lindsay, Aldrich Nelson Weight & Esplin, Provo, for Appellant.

Mark L. Shurtleff, Attorney General, and Kenneth A. Bronston, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges BENCH, ORME, and THORNE.

## OPINION

THORNE, Judge.

¶ 1 Appellant Angie Brake (Brake) appeals from a conviction for Attempted Possession of a Controlled Substance, a class A misdemeanor, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.1999). We affirm.

## BACKGROUND

¶ 2 On January 29, 2000, at approximately 11:45 p.m., Utah County Deputy Sheriff Neil Castleberry (Castleberry) observed two vehicles stopped in a small pullout on the side of the road west of the Geneva Steel plant. Castleberry pulled up behind the vehicles to inquire whether the occupants of either vehicle needed assistance. Because he was merely inquiring whether anyone needed assistance, Castleberry did not have his emergency lights on when he approached the vehicles. Castleberry, however, was aware that the vehicles were stopped in an area "known for frequent criminal activity."

¶ 3 Upon exiting his vehicle, Castleberry approached one of the two vehicles, a green Nissan, which he believed had the engine running. Castleberry observed a young woman in the driver's seat. He asked the woman to roll down the window, which she did, and then he asked for her driver license. The woman told Castleberry that she was fifteen years-old and that she did not have a driver license. The woman also told Castleberry that she had not been driving the vehicle. Castleberry then inquired about the vehicle's owner, and the woman told him that the vehicle's owner was sitting in the backseat.

¶ 4 Because the vehicle's windows were fogged, Castleberry was unable to see clearly into the backseat. He was able, however, to

see that two persons, a male and a female, were sitting in the backseat. Because his vision was obscured, Castleberry opened the backseat door to speak to the two persons. Brake, who was sitting in the backseat, identified herself as both the vehicle's owner and the driver. Brake told Castleberry that she and the others, including the individuals in the other vehicle, were from Sanpete County. She also told Castleberry that she had changed seats with the fifteen-year-old when they arrived at their current location.

¶ 5 Castleberry asked Brake for her identification. Brake told Castleberry that her identification was in her purse and pointed to the front passenger seat, where no one was sitting. Because the purse was located "in a dark area over which he h[ad] no control[,]" [1] Castleberry decided, for safety reasons, to retrieve the purse himself. Castleberry walked around to the passenger side of the front seat and opened the vehicle door to retrieve the purse. As Castleberry reached inside the vehicle to remove the purse, he saw, in plain view, a white bindle next to the purse near the vehicle's console.

¶ 6 Castleberry picked up the purse and asked for its owner. Someone sitting in the Nissan told Castleberry that the purse belonged to "Lilly," and that she was sitting in the other vehicle. Castleberry took the purse and the bindle over to the other vehicle. He opened the vehicle's door and asked for Lilly. Castleberry also asked the persons sitting in the vehicle if the purse belonged to Lilly. One of the two persons identified herself as Lilly and told Castleberry that she owned the purse. Lilly, however, denied owning the bindle. Castleberry had Lilly exit the vehicle and continued to question her at his patrol car. He also tested the white powdery substance contained in the bindle, which tested positive for cocaine.

¶ 7 Castleberry proceeded back to the Nissan and asked the three individuals who owned the cocaine. Castleberry received no response from them. Unable to determine who owned the cocaine, Castleberry told Brake that she would be arrested if no one

claimed ownership because she owned the vehicle. Brake then admitted that the cocaine belonged to her and that she and the others had used the cocaine throughout the evening. Castleberry arrested Brake and called for backup. A subsequent search of the Nissan uncovered drug paraphernalia.

¶ 8 Brake was bound over on charges of possessing a controlled substance and unlawful possession of drug paraphernalia. Brake subsequently filed a motion to suppress both the cocaine and her incriminating statements.[2] The trial court denied Brake's Motion as it pertained to the admissibility of the cocaine and granted her Motion pertaining to her incriminating statements.

¶ 9 In denying that portion of Brake's Motion to Suppress, the trial court concluded that opening the vehicle's front passenger door to retrieve the purse was justifiable under the officer safety exception to the Fourth Amendment's warrant requirement. The trial court relied upon the following facts in reaching its decision:

1. [Castleberry] was alone on patrol and had not yet called for backup.

2. It was late at night; it was dark and none of the occupants lived in Utah County.

3. The road is located in a remote area of Utah County and ... Castleberry described it as a "deserted road."

4. There were two vehicles at the site with occupants in each (three occupants in the subject vehicle and two occupants in the pickup truck which was parked contiguous).

5. This was an area of frequent criminal activity.

6. [Castleberry's] vision was severely restricted because of the darkness and the fact that all of the windows were fogged up.

7. The other vehicle was running and ... Castleberry testified he believed that the subject vehicle had the engine on with a fifteen-year-old unlicensed girl behind the wheel and two other passengers in the back seat.

---

1. This quote comes from the trial court's Ruling on Motion to Suppress, ¶ 10.

2. Castleberry had questioned Brake before administering her *Miranda* warning.

¶ 10 As a result of the trial court's decision, Brake pleaded guilty to attempted possession of a controlled substance. She conditioned her plea on the right to appeal the trial court's partial denial of her Motion to Suppress. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 11 Brake argues the trial court erred by denying that portion of her Motion to Suppress alleging that by opening the passenger door to obtain the purse, Castleberry's actions constituted an impermissible warrantless search. In reviewing a motion to suppress, "[a] trial court's factual findings are reviewed deferentially under the clearly erroneous standard, and its conclusions of law are reviewed for correctness with some discretion given to the application of the legal standards to the underlying factual findings." *State v. Loya,* 2001 UT App 3, ¶ 6, 18 P.3d 1116.

## ANALYSIS

¶ 12 Brake argues that Castleberry conducted an impermissible warrantless search when he opened the Nissan's front passenger door to retrieve the purse, and therefore, violated her Fourth Amendment right against unreasonable searches and seizures. To support her argument, Brake relies upon *State v. Schlosser,* 774 P.2d 1132 (Utah 1989).

¶ 13 In *Schlosser,* a Utah Highway Patrol trooper stopped a vehicle for a traffic violation. *See id.* at 1133. As the vehicle pulled to the side of the road, the trooper observed the defendant, a passenger in the vehicle, "bending forward, acting fidgety, turning to the left and to the right, and turning back to look at the [trooper]." *Id.* The movement drew the trooper's attention.

¶ 14 After the vehicle stopped, the driver exited the vehicle, approached the trooper, and presented the trooper his license and registration. *See id.* at 1133–34. All the while, the trooper noticed that the defendant "continued to move about the cab of the truck." *Id.* at 1134. As a result of the

defendant's behavior, the trooper concluded that the defendant "was trying to hide something." *Id.* The trooper approached the passenger side of the vehicle, tapped on the window, and opened the door. *See id.* The trooper "scanned the interior of the truck for contraband and saw a bag of marijuana in the passenger door pocket." *Id.* The trooper also "smelled marijuana smoke." *Id.* The trooper arrested both the defendant and the driver.

¶ 15 The defendant moved to suppress the marijuana.[3] The trial court granted the defendant's motion and suppressed "all the evidence seized." *Id.* The trial court concluded that the trooper "acted on 'a mere suspicion that the defendant . . . was engaged in criminal activity,' and had no legal basis for the search and seizure." *Id.* (citation omitted). The State appealed.

¶ 16 The Utah Supreme Court affirmed the trial court's ruling. *See id.* at 1139. The court concluded that the trooper's opening the vehicle door was a "search." *Id.* at 1135. The court also concluded that the search was unlawful. *See id.* at 1135–36. The court reasoned that

[the trooper's] testimony established that his opening the car door exceeded the legitimate objectives of a traffic stop. The [trooper's] "clear initial objective" in opening the car door was to see whether [the defendant] was "hiding something." However, without probable cause to justify it, that act clearly exceeded the lawful scope of a legitimate government interest.

*Id.*

¶ 17 Finally, the court explained that the trooper "cited no safety concerns as the basis for his actions; he sought only to investigate the possibility that defendants were engaged in illegal activity." *Id.* at 1137. Because of the safety concerns in the present case, we conclude that *Schlosser* is inapplicable to the present matter.

¶ 18 The facts and the reasoning set forth in *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), are applicable to the present matter. In *Class,* the United

---

3. The defendant also moved to suppress drug paraphernalia and two firearms, which the trooper discovered while searching the vehicle. *See id.*

States Supreme Court held that a minimally intrusive warrantless search was justified in light of the Fourth Amendment protection against unreasonable searches when balanced against concerns for police officer safety. *See id.* at 117–18, 106 S.Ct. at 967–68. ·

¶ 19 In *Class,* police officers stopped the defendant for two traffic violations. *See id.* at 107–08, 106 S.Ct. at 962. Upon stopping his vehicle, the defendant exited and approached one of the two officers conducting the stop. *See id.* at 108, 106 S.Ct. at 963. While one of the officers spoke with the defendant, the other officer proceeded to the defendant's vehicle and opened the door in an effort to locate the VIN number. *See id.* The officer was unable to locate the VIN number on the doorjamb, and, subsequently, he reached into the vehicle's interior to remove some papers that obscured the area of the dashboard where the VIN number was also located. *See id.* Upon doing so, the officer saw a gun protruding from underneath the driver's seat. *See id.* The officers arrested the defendant. *See id.*

¶ 20 The defendant filed a motion to suppress the gun, which the trial court denied. *See id.* Ultimately, the New York Court of Appeals reversed the trial court, concluding that the officer's intrusion into the vehicle was a search that was not justified because the facts of the case " 'reveal no reason for the officer to suspect other criminal activity [besides the traffic infractions] or to protect his own safety.' " *Id.* at 109, 106 S.Ct. at 963 (quoting *State v. Class,* 63 N.Y.2d 491, 483 N.Y.S.2d 181, 472 N.E.2d 1009, 1012 (1984)).

¶ 21 The United States Supreme Court reversed. The Court determined that "the governmental interest in highway safety served by obtaining the VIN is of the first order, and the particular method of obtaining the VIN here was justified by a concern for the officers' safety." *Id.* at 118, 106 S.Ct. at 968. The Court reasoned that "[t]he search was focused in its objective and no more intrusive than necessary to fulfill that objective." *Id.*

¶ 22 As a result, the Court held that

this search was sufficiently unintrusive to be constitutionally permissible in light of the lack of reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations. Any other conclusion would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct—viewing the VIN—which, as we have said, the officers were entitled to do as part of an undoubtedly justified traffic stop.

*Id.* at 119, 106 S.Ct. at 968.

¶ 23 The Utah Supreme Court has held that a governmental interest exists in "removing unlicensed drivers from the road for public safety reasons." *State v. Harmon,* 910 P.2d 1196, 1203 (Utah 1995) (addressing the public safety concerns of individuals driving with a suspended license). Moreover, Utah Code Ann. § 41–8–1(1) (1998) prohibits a person under sixteen years old from operating a motor vehicle. And, Utah Code Ann. § 41–6–165 (1998) makes it a crime for a vehicle's owner to allow an underage and unlicensed person to operate that vehicle.[4] Having discovered an underage and unlicensed individual at the wheel of a running vehicle, we conclude that it was both justifiable and reasonable for Castleberry to request from Brake, the vehicle's owner, her driver license "in light of the governmental interest in removing unlicensed drivers from the road for public safety reasons." *Harmon,* 910 P.2d at 1203.

¶ 24 Our conclusion that Castleberry was both justified and reasonable in his request to Brake, also leads this court to conclude that the United States Supreme Court's reasoning in *Class,* concerning police officer safety, is applicable in this matter. Specifically, in the situation facing Castleberry, he was justified in his decision to retrieve the purse.

¶ 25 Castleberry approached two vehicles, both of which he believed to be running, in a desolate and frequent crime area. After he had encountered the Nissan's occupants,

---

4. Utah Code Ann. § 41–6–165 (1998), states "It is unlawful for the owner ... of any vehicle ... knowingly to permit the operation of such vehi-

cle upon a highway in any manner contrary to law." *Id.*

Castleberry discovered that (1) the individual in the Nissan's driver's seat was fifteen years-old and did not possess a driver license; (2) due to the darkness and fogged up windows, he was unable to see clearly into the Nissan's backseat to identify the passengers sitting in the backseat; (3) the individuals in both vehicles totaled five; and (4) the purse was located in a dark area out of his control.

¶ 26 When Castleberry set out to retrieve the purse, "[t]he search was focused in its objective and no more intrusive than necessary to fulfill that objective." *Class*, 475 U.S. at 118, 106 S.Ct. at 968. As in *Class*, Castleberry did not "root about the interior of [Brake's vehicle]." *Id.* Further, "[Castleberry] did not reach into any compartments or open any containers." *Id.* Ultimately, Castleberry's "safety [and a legitimate public safety concern] w[ere] served by the [minimal] governmental intrusion." *Id.* at 117, 106 S.Ct. at 968. The trial court's decision to deny Brake's Motion to Suppress, as it relates to Castleberry's retrieval of the purse, is therefore affirmed.[5]

¶ 27 I CONCUR: RUSSELL W. BENCH, Judge.

ORME, Judge (dissenting).

¶ 28 Two facts, omitted from the main opinion, bear mention. First, the officer ostensibly set about to see if the occupants of the lawfully parked vehicles needed assistance even though nothing in the record suggests a trunk or hood was open, jacks and a spare tire were positioned by either vehicle, or emergency flashers were activated. Second, the officer expressly testified that he elected to open the one vehicle's front door and retrieve the purse so that he could "make sure that there weren't any weapons."[1]

¶ 29 Utah law concerning the search of the interior of a vehicle for weapons, in the course of an investigatory stop, is clear. As explained in a series of cases, none of which are cited in the main opinion, an officer may conduct a weapons search only if he "reasonably believes a suspect is dangerous and may obtain immediate control of weapons." *State v. Bradford*, 839 P.2d 866, 870 (Utah Ct.App. 1992). This regimen also applies to traffic stops, even though they are regarded as potentially dangerous. *See id.* at 869. Such a search is justified only if " 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety ... was in danger.' " *State v. Roybal*, 716 P.2d 291, 293 (Utah 1986) (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). And such a belief can originate in the officer's contemporaneous observations—either of a weapon or of some furtive movements consistent with retrieval of a weapon—or in the inherent nature of the underlying offense. *See State v. Chapman*, 921 P.2d 446, 454 (Utah 1996).

¶ 30 Thus, in *Bradford*, a weapons search was permitted not because of a generalized safety concern or because the intrusion was deemed slight, but because the officer noticed the driver pull a black bag toward the front of the car from an area where the

---

5. Contrary to the dissent's conclusion, Castleberry neither requested nor conducted a weapons search of either the vehicle or the purse. Castleberry merely retrieved the purse from a dark area within the vehicle that was outside of his immediate control and sought to convey the purse to its owner. Castleberry did not search the purse, and therefore, as we stated above, to the extent that Castleberry's action constituted a search it was focused in its objective and no more intrusive than necessary. *See New York v. Class*, 475 U.S. at 118, 106 S.Ct. at 968. Ultimately, Castleberry's action helped to ensure not only his safety, but also the safety of those in the vehicle.

1. As pointed out in footnote 5 of the main opinion, the officer's purpose—to "make sure that there weren't any weapons"—was not disclosed to the occupants of the vehicle. Contrary to the claim in that footnote, however, the officer candidly admitted this was his purpose in entering the vehicle and retrieving the purse himself—this is not something I have created from whole cloth. The officer satisfied himself that there were no weapons in the area where he located the purse. It is true he did not search the purse, but at that point in time he had seen the bindle and the focus of the encounter had therefore dramatically changed. Moreover, the record does not disclose the size, shape, or weight of the purse. It is entirely possible the officer did not search the purse only because its size, shape, and weight were inconsistent with the possibility it contained a firearm.

officer earlier observed a rifle. *See* 839 P.2d at 871. And in *State v. Strickling,* 844 P.2d 979 (Utah Ct.App.1992), a weapons search was upheld where a vehicle's occupants were suspected of involvement in a burglary. *See id.* at 984 (noting " '[i]t is reasonable for an officer to believe that a burglar may be armed with weapons' ") (quoting *State v. Carter,* 707 P.2d 656, 660 (Utah 1985)). Conversely, in reversing this court in *Chapman,* the Utah Supreme Court held a weapons search was not warranted, even though the suspect was a gang member who had reputedly carried a weapon in the past, where " '[n]othing about the nature of the underlying offense being investigated' "—i.e., parking on school property after hours— " 'prompted a concern for safety ... [and][n]othing defendant did, by way of conduct, attitude, or gesture, suggested the presence of a weapon in the vehicle.' " *State v. Chapman,* 921 P.2d 446, 454 (Utah 1996) (quoting *State v. Chapman,* 841 P.2d 725, 732 (Utah Ct.App.1992) (Orme, J., dissenting)).

¶ 31 Applying the correct legal doctrine to this case, rather than the jurisprudence which has developed concerning law enforcement's entitlement to ascertain a vehicle identification number, leads to the opposite result from that reached by the majority. The officer did not see any weapons, nor does the record suggest he observed any furtive movements or other conduct consistent with the retrieval or presence of a weapon. And nothing about a motorist possibly needing assistance, or even underage driving, by its very nature suggests the presence of weapons. It follows that the officer was not entitled to search even part of the interior of the vehicle for weapons while conducting his investigation of possible underage driving, and that all evidence found as a result of that search should have been suppressed.